William Eugene ASQUITH, Plaintiff,

v.

VOLUNTEERS OF AMERICA, William H. Fauver, Dorothy Keller and Ken Savko, Defendants.

Civil Action No. 95–300(JEI).

United States District Court, D. New Jersey.

March 20, 1998.

Loughlin & Latimer by Stephen M. Latimer, Lucille M. Rosano, Hackensack, NJ, for Plaintiff William Eugene Asquith.

Peter Verniero, Attorney General of New Jersey by Jennifer L. Kleppe, Deputy Attorney General, Trenton, NJ, for Defendants William Fauver and Dorothea Keller.

Law Offices of Thomas Dempster, III by Joseph M. Assan, Mt. Laurel, NJ, for Defendants Volunteers of America and Ken Savko.

## OPINION

IRENAS, District Judge.

This matter comes before this Court on the parties' cross motions for summary judgment as to whether plaintiff William Asquith's due process rights were violated when he was terminated from a New Jersey Department of Corrections community work release program despite a finding that he was not guilty of the disciplinary infraction that had led to his initial removal from the program. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons set forth below, this Court holds that plaintiff did not have a protected liberty interest in continued participation in his work release program. This Court also finds that Asquith was not deprived of personal property in violation of the Constitution.

## I. BACKGROUND

### A. Facts

The material facts in this case are undisputed. Plaintiff William Asquith began serving a five-year term of imprisonment under the custody of the New Jersey Department of Corrections ("DOC") for possession of cocaine with intent to distribute on October 1, 1993. In the Summer of 1994, Asquith began participating in a New Jersey Residential Community Release Agreement Program ("the program," "the work release program"). At all times relevant to this case, the terms and conditions of inmates' participation in the program were governed by the regulations set forth in N.J.A.C. 10A:20–4.1 to 10A:20–4.46.[1]

Pursuant to the terms of the program, Asquith lived in a halfway house in Camden run by Volunteers of America ("VOA"). Inmates in the work release program were required to have a job or to attend school. Asquith worked as a maintenance mechanic at Cramer Hill Apartments, in the Cramer Hill section of Camden. In addition to being permitted to leave their halfway houses for work or school, inmates in the work release program could obtain passes to visit family, shop, eat at restaurants or go to the local YMCA, but only with specific passes obtained for each such outing.

On Friday, October 28, 1994, Asquith signed in at the front desk of VOA at approx-

---

1. These regulations were enacted pursuant to N.J.S.A. 30:4–91.2, which authorizes the Commissioner of the New Jersey Department of Corrections to designate places of confinement for inmates and to transfer inmates between places of confinement. Specific features and provisions of these regulations are discussed below.

imately 7:30 p.m. VOA case aides Chris Arroyo and Ed McNair approached Asquith. McNair told Asquith to remain where he was. McNair administered a breathalyser test to Asquith and then told him to go to his room. Asquith has testified that McNair behaved suspiciously during these events, stating at one point: "[W]ho do we want to send back, a black guy or a cracker today." (Dep. of William Asquith at 52). Asquith believed he was being set up for a return to a correctional facility. Shortly after Asquith returned to his room, officers from Riverfront Prison ("Riverfront") arrived to take Asquith to Riverfront based on Asquith's reported use of alcohol, a "major violation" under New Jersey Regulations warranting termination from the program.[2] Asquith was placed in pre-hearing detention at Riverfront.

On October 31, 1994, Department of Corrections ("DOC") adjudication officer Kathy Ireland held a hearing regarding the alcohol charge against Asquith. The purpose of the hearing was to determine whether Asquith was guilty of a major violation and thus subject to disciplinary action, not to determine whether he could return to VOA. The evidence before Ireland was as follows. Arroyo's and McNair's reports stated that Asquith had had glassy eyes and had smelled of alcohol and that Asquith's breathalyser test

had been positive. One Riverfront officer involved in the pick-up and transfer of Asquith reported that Asquith had walked with a stagger and had smelled of alcohol. Other Riverfront officers said Asquith had not appeared to be intoxicated. See Written Reports of Beverly, Danforth, Ealy, Molock, and Renshaw, Cert. of Stephen M. Latimer, Ex. I, at D125–30.[3] A Riverfront doctor who had examined Asquith upon his arrival at the prison reported that he had not appeared to be intoxicated. See Medical Reports, Cert. of Latimer, Ex. I at D121, 124. Asquith denied having been drinking. Noting the conflicting evidence and giving Asquith the "benefit of [the] doubt," Ireland found Asquith "not guilty." Adjudication of Disciplinary Charge, Cert. of Latimer, Ex. I at D119–20.

Asquith was not returned to VOA. He remained at Riverfront for approximately one week before being transferred to Bayside Prison ("Bayside"). Upon his arrival at Bayside, Asquith was placed in maximum custody. Some time after November 28, 1994, his custody status was changed to full minimum. According to Asquith, he "asked everyone" if he could go back to the halfway house. He contacted prison administrators and the community release coordinator about returning to work release. The essence of the response he received was that he would

2. See N.J.A.C. 10A:20–4.21; see also VOA "Statement of Policy," Cert. of Stephen M. Latimer, Ex. H (alcohol use a violation of VOA rules). New Jersey regulations also provided that "[m]ajor disciplinary charges shall result in the immediate transfer of the inmate to a correctional facility."

3. McNair and Arroyo made their observations at approximately 7:30 p.m. Riverfront Officer Danford, one of the Riverfront officers who went to VOA to pick up Asquith, "observed [Asquith] walking with a stagger and a smell of alcohol." Officers Beverly and Molock, and Sergeant Ealy also participated in the pick up. They said that Asquith did not appear intoxicated. The evidence viewed most favorably to Asquith is that Danford, Beverly, Molock and Ealy first came into contact with Asquith at about 8:00 p.m. or shortly thereafter. Lieutenant Stevens, shift supervisor at Riverfront, noted at 8:35 p.m. on the "Authorization for Prehearing Detention" form that "in the opinion of the custody staff, [Asquith's] behavior appears to be impaired." The Riverfront doctor's first contact with Asquith was

at approximately 8:35 p.m. Asquith took a shower prior to being moved to detention. Dep. of Asquith at 70. Officer Renshaw, who escorted Asquith from intake to detention at Riverfront at 9:15 p.m., reported no observations concerning alcohol or intoxication. Molock, who assisted Renshaw in moving Asquith to detention, did not report any observations concerning the smell of alcohol or signs of intoxication.

From this evidence it is clear that the earliest observers—McNair and Arroyo—say Asquith showed signs of alcohol use. These earliest reports are the most reliable. Moreover, one Riverfront officer observed signs of alcohol use a half an hour or more after McNair and Arroyo did. Two other witnesses who saw Asquith at that time observed no signs intoxication. Two other people who said Asquith did not appear intoxicated did not make their observations until at least one hour after the earliest witnesses observed Asquith. Of those two, one observed him after he had showered. Of course it must be borne in mind that the prohibited activity was alcohol use, not intoxication.

have to reapply to the program and wait to be considered like any other inmate applying for program participation. There simply was no procedure for returning an inmate to the program when he was found not guilty of the violation that prompted his removal.[4] There is a high rate of turnover in the halfway houses, the Department of Corrections pays contracting agencies such as VOA for all spaces in the halfway houses regardless of whether the spaces are occupied, and available spaces are filled right away with inmates from the program's waiting list.

Asquith also sought the return of certain property he had left at VOA. He received some but not all of his belongings. Asquith remained imprisoned at Bayside until he was paroled on January 3, 1995.

### B. *Procedural History*

Asquith filed a section 1983 complaint—dated December 1, 1994—on January 11, 1995. The complaint named William H. Fauver, former Commissioner of the DOC, and Dorothy Keller, Chief of the Bureau of Contract Administration for the DOC[5] (collectively, "the DOC defendants"). It also named Ken Savko, Director of VOA; Robert Gregory, a VOA Case Manager who was on the scene during a portion of Asquith's interaction with McNair and Arroyo; VOA as a corporation; and Arroyo and McNair (collectively, "the VOA defendants").

The legal substance of Asquith's complaint is that he was entitled to return to the work release program after he was found not guilty of an alcohol violation. Put differently, he claims he could not be terminated from the program absent due process and a find-ing that he had committed a major violation. Asquith's post-complaint submissions make it clear that his claim is that he was entitled to due process before any decision not to send him back to the work release program could be made and implemented. Thus, although it is clear that he objects to McNair and Arroyo's conduct leading to his initial removal from VOA, Asquith is not understood by this Court to be actively pressing a claim that his initial transfer to Riverfront for pre-hearing detention violated his due process rights.

Asquith's complaint alleges that he suffered damages in the form of lost personal property—including work tools worth $3,000—lost program privileges, lost employment, two lost civil service "job bids," a missed opportunity to take the November 11, 1994, board of electricians examination, lost vocational and rehabilitative services and lost wages. His complaint also states that as a result of his charged alcohol violation "Plaintiff may receive a new Parole ineligibility date of up to and beyond twelve months." To the extent that Asquith sought injunctive relief in addition to monetary damages, this prayer for relief has become moot.[6]

By Order entered January 11, 1995, this Court granted Asquith's application to proceed *in forma pauperis* and dismissed his complaint as frivolous. Asquith appealed. By Bench Opinion and Order dated March 22, 1996, the Third Circuit Court of Appeals vacated the order of dismissal and remanded the case to this Court for "development of a record as to the existence of a liberty interest under the due process clause itself."[7]

---

4. State regulations did provide that the Inter-Institutional Classification Committee, the body responsible for approving inmates for work release, would "review" disciplinary transfers of inmates from release agreement programs to correctional facilities at its next regularly scheduled meeting. N.J.A.C. 10A:20–4.45(c).

5. Asquith misidentified Keller as "community release coordinator."

6. Based on the notion that Asquith was challenging the constitutionality of his confinement, the DOC defendants have argued that Asquith was required to file a habeas corpus petition and was barred from filing a § 1983 action. The parties have briefed this issue and called recent cases to this Court's attention. However, as a practical matter this issue is irrelevant. As discussed briefly below, *see infra*, Part III.B., this Court does not find that Asquith is challenging the fact or duration of his confinement in any meaningful way. At this point, Asquith simply seeks damages for an alleged constitutional violation.

7. In its remand the Third Circuit's suggested that it was vacating this Court's dismissal order because this Court "did not have the benefit of the Supreme Court's decision in [*Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)]." As discussed below, *see infra*, Part II.B., this Court finds that *Sandin* supports this

Now before this Court are the respective cross motions for summary judgment filed by Asquith, Savko and VOA, and the DOC defendants.[8]

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* 477 U.S. at 248. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Idus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating, Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992).

## III. DISCUSSION

Asquith has brought suit pursuant to 42 U.S.C. § 1983, alleging that defendants deprived him of his Fourteenth Amendment right to due process of law. As noted above, this Court does not understand Asquith to be claiming at this point that he was entitled to due process prior to his initial removal from VOA. Such a claim would likely be rejected outright. The central claim pressed by Asquith is that defendants deprived him of a protected liberty interest when, without giving him any kind of hearing and without finding him guilty of an infraction, they failed to return him to his work release program.[9]

### A. Constitutionally–Created Protected Liberty Interest

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (citing *Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)). Plaintiff asserts that he possessed a protected liberty interest in re-

---

Court's determination that Asquith did not have a protected liberty interest.

8. It appears that Gregory, Arroyo and McNair never were served with complaint and summons in this action. Plaintiffs' motion papers and supporting briefs do not list these individuals in the case caption.

9. Asquith's suit against Fauver and Keller in their official capacities must be dismissed because it is no different from a suit against the State itself and the State is not a "person" potentially liable under § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

maining in the work release program which was created by the Constitution itself.

■ The Supreme Court has recognized that, in certain circumstances, the Constitution itself may give rise to a protected liberty interest. *See, e.g., Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause"); *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (" '[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.' ") (quoting *Greenholtz v. Inmates of the Neb., Penal and Correctional Complex,* 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)); *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (protected liberty interest in not being transferred from prison to mental hospital); *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (child has substantial liberty interest in not being confined unnecessarily for medical treatment); *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (inherent liberty interest in remaining free on parole).

■ Generally, however, prisoners under confinement do not have inherent liberty interests in particular modes, places or features of confinement or custody. *See, e.g., Hewitt,* 459 U.S. at 466–68 (confinement to general prison population cell rather than restrictive administrative segregation quarters); *Olim v. Wakinekona,* 461 U.S. 238, 244–48, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (no inherent liberty interest implicated in interstate prison transfer); *Meachum,* 427 U.S. at 225 (transfers of prisoner from one institution to another); *Higgason v. Farley,* 83 F.3d 807, 809 (7th Cir.1996) (lockdowns and prohibitions against leaving cell area). As the Supreme Court has stated: "[Our] decisions require that '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison officials to judicial oversight.' " *Hewitt,* 459 U.S. at 468 (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

■ Asquith acknowledges readily, as he must, that he had no inherent liberty interest in initial placement in the work release program. *See Winsett v. McGinnes,* 617 F.2d 996, 1004 (3d Cir.1980) (en banc) (no inherent liberty interest creating right to enter work release program), *cert. denied sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981); *cf. Greenholtz v. Inmates of the Neb. Penal and Correctional Complex,* 442 U.S. 1, 9–11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (receipt of parole); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (receipt of good-time credits); *Bowser v. Vose,* 968 F.2d 105, 106 (1st Cir.1992) (denial of furlough); *Joihner v. McEvers,* 898 F.2d 569, 571 (7th Cir. 1990) (transfer to work camp); *James v. Quinlan,* 866 F.2d 627, 629 (3d Cir.) (prison job assignments), *cert. denied,* 493 U.S. 870, 110 S.Ct. 197, 107 L.Ed.2d 151 (1989).

■ Asquith's contention is that he had a liberty interest, arising from the Due Process Clause itself, in continued participation in the work release program. He likens his community work release program to parole or preparole. He argues that, like a parolee, he had obtained a degree of freedom sufficient to create a protected liberty interest in remaining in his work release program.

It is true that an individual once paroled possesses a liberty interest in remaining conditionally free on parole. *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *see Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (liberty interest in continued probation); *cf. Wolff,* 418 U.S. at 555–56 (retention of earned good time credits). In addition, the Supreme Court recently held that an Oklahoma preparolee had a protected liberty interest in continued participation in his preparole program. *Young v. Harper,* 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997).

Because Asquith relies heavily on *Young* for the proposition that "a person held in the

custody of the Department of Corrections who is in a pre release program has a liberty interest akin to that of a parolee in not having his pre release status arbitrarily revoked," Plaintiff's Brief in Support of Motion for Summary Judgment at 12, the discussion here begins with an examination of *Young*.

In *Young*, the Supreme Court considered "the narrow question whether a [preparole] program employed by the State of Oklahoma to reduce the overcrowding of the prisons was sufficiently like parole that a person in the program was entitled to the procedural protections set forth in *Morrissey v. Brewer* ... before he could be removed from it." 117 S.Ct. at 1150. The Court held that "the program, as it appear[ed] to have been structured at the time ... *differed from parole in name alone*" and thus affirmed the Tenth Circuit's holding that removal from the program required the same due process protections involved in parole revocation. *Id.* 117 S.Ct. at 1150 (emphasis added).

*Young* involved Oklahoma's "Preparole Conditional Supervision Program," a program for which a prisoner would become eligible after completing 15% of her sentence. Harper was released under the program but then denied parole five months later and returned to prison. *Id.* at 1150–51. The Court began its analysis by recognizing that "'[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.'" *Id.* at 1151 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). The Court then stated:

In *Morrissey*, we described the "nature of the interest of the parolee in his continued liberty":

"[H]e can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison.... The parolee has relied on at least an implicit promise that parole will be revoked only if he

fails to live up to the parole conditions...."

*Id.* 117 S.Ct. at 1151–52 (quoting *Morrissey*, 408 U.S. at 482). The Court explained that "[t]his passage could just as easily have applied to respondent while he was on preparole." *Id.* 117 S.Ct. at 1152. The Court listed the relevant factors: (1) Harper was released from prison before his sentence expired; (2) he kept his own residence; (3) he "sought, obtained, and maintained a job;" and (4) "he lived a life generally free of the incidents of imprisonment." *Id.* at 1152. In short, "[n]one of the differences ... [between parole and preparole in Oklahoma] support[ed] a view of the Program as having been anything more than parole as described in Morrisey." *Id.* at 1152.

Despite Asquith's intimation to the contrary, then, *Young* did nothing more than reaffirm Morrissey's holding that a parolee — whatever else he might be called — has a protected liberty interest in remaining conditionally free on parole. Thus, *Young* did not advance the relevant law concerning the creation of protected liberty interests beyond *Morrissey*. Accordingly, this Court hews to the principles set forth in *Morrissey*. This Court looks to these principles not to determine whether Asquith was like a parolee, strictly speaking, but to determine whether he had acquired that type and degree of liberty which the *Morrissey* Court found gives rise to a protected liberty interest.

The *Morrissey* Court understood a parolee's liberty interest to inhere in the following positive incidents of parole and related negative incidents of its revocation: (1) conditional ability to be gainfully employed; (2) conditional "free[dom]" to be with family and friends and to form the other enduring attachments of normal life;" (3) generally, a condition "very different from that of confinement in a prison;" (4) reliance "on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions"; (5) in some instances, the fact of the parolee's having been on parole for a number of years, and having reached a point where he is "living a relatively normal life"; and (6) in some instances, the fact of the parolee's "fac[ing] lengthy incarceration if his

parole is revoked." 408 U.S. at 482. The *Morrissey* Court concluded "that the liberty of a parolee, although indeterminate, includes many of *the core values of unqualified liberty* and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* (emphasis added).

Asquith's liberty did not include "many of the core values of unqualified liberty." He was fundamentally unlike the individual envisioned in *Morrissey.* The parolee has been released from incarceration and has left his life of institutional confinement behind. Liberty for him is the norm notwithstanding that there are certain conditions attached to his freedom. The loss of his liberty is recognized as a grievous loss because at base it is the return to a life of incarceration.

Asquith's life, in contrast, was one of incarceration, strict limitation and certain sharply conscribed privileges. At all times he was considered an "inmate." *See* N.J.A.C. 10A:20–4.1 to 4.45. His home was a penal institution. He might have resided beyond actual penitentiary walls, but he had not been "released" from prison or liberated from institutional life. This fact alone is sufficient to doom his inherent liberty interest claim. *See Harper v. Young,* 64 F.3d 563, 566 (10th Cir.1995), *aff'd, Young v. Harper,* 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997); *Edwards v. Lockhart,* 908 F.2d 299, 302 (8th Cir.1990); *Brennan v. Cunningham,* 813 F.2d 1, 5 (1st Cir.1987); *Whitehorn v. Harrelson,* 758 F.2d 1416, 1421 (11th Cir.1985).

More generally, unlike a parolee's freedoms, Asquith's freedoms were carved out of his status as an incarcerated person and were heavily qualified. Any time Asquith sought to visit family, go shopping or dine out, he was required to obtain permission or a pass from VOA. *See* N.J.A.C. 10A:20–4.36; Dep. of William Asquith at 43, 45–46; Dep. of Ken Savko at 24, 25, 26, 30. Family visits to VOA were supervised, limited to designated areas, and limited in time. Dep. of Savko at 58–59, 43–44. Asquith needed an approved furlough plan in order to be eligible for an overnight furlough. N.J.A.C. 10:A20–4.38. Furloughs generally could not exceed two nights or fifty-six hours within a seven-day period. *Id.* 10A:20–4.37. In the event VOA

were unaware of Asquith's whereabouts for two consecutive hours, he would be deemed an escapee and the DOC would be notified. N.J.A.C. 10A:20–4.39; "Residential Community Release Agreement Program Application," Cert. of Stephen M. Latimer, Ex. G at 5 [hereinafter, "Release Agreement Program Application"].

The details of Asquith's life were regulated, monitored heavily and marked by proscriptions. He was required to sign in and out of VOA any time he entered or exited. Dep. of Dorothy Keller at 31; Dep. of Savko at 56. He was required to check in by phone with VOA several times each day. Dep. of Keller at 31. VOA conducted inmate counts four time daily. Dep. of Savko at 56. VOA placed random calls to inmates' work sites to verify their presence. *Id.* at 56–57. Asquith's travel time to and from work was sharply limited, Dep. of Asquith at 38–39, 39–40, and he was required to travel to work exclusively by public transportation, *id.* at 103–04. He was written up for a minor violation on one occasion when he was three minutes late returning to VOA. Asquith was required to submit to urine monitoring. N.J.A.C. 10A:20–4.22; *see also* Release Agreement Program Application at 6. He could not open a checking or charge account, make a purchase on an installment plan or enter into any contract. N.J.A.C. 10A:20–4.34.

Finally, any reliance interest on Asquith's part concerning continued participation in the work release program was of a lesser degree than a parolee's reliance interest concerning his continuing parole. Asquith was on notice of the contingent nature of his program participation. The program application provided: (1) "A new Agreement must be developed and approved should your community release program be terminated and you wish to participate in a similar program;" (2) "For sufficient reason, this Agreement can be canceled at any time by the Superintendent;" and (3) the Agreement will be in effect for twenty-four months and "may" be renewed following Departmental review of a releasee's participation. Release Agreement Program Application at 3–4. In addition, New Jersey regulations provided that the

Commissioner "may at any time transfer an inmate from one place of confinement to another," N.J.A.C. 10A:20–4.2, and that an inmate could be returned to a correctional facility for various reasons including, but "not limited to," "fail[ure] to make a satisfactory adjustment," showing signs of being an escape risk, a change in "minimum custody status" due to the receipt of a detainer, *id.* 10A:20–4.44. The filing of disciplinary "charges" against an inmate would result in his immediate transfer to a correctional facility. *Id.* 10A:20–4.21(d) (emphasis added). A change in an inmate's parole eligibility date also could result in his being removed from the program. *Id.* 10A:20–4.18. Finally, one's participation in the program was contingent at all times upon both the Department of Corrections' continuing contractual relationship with private halfway houses and those facilities' continued existence. Extrinsic events, then, could control Asquith's destiny.[10]

In conclusion, while Asquith lost freedoms and privileges when he was terminated from his work release program, he did not lose "core values of unqualified liberty" as the Supreme Court has understood such values. Accordingly, this Court holds that Asquith did not have a liberty interest arising from the Due Process Clause in continued participation in his work release program. This holding is supported strongly by the case law. *See Brennan v. Cunningham,* 813 F.2d 1 (1st Cir.1987); *Hake v. Gunter,* 824 F.2d 610, 613–14 (8th Cir.1987) (dicta); *Whitehorn v. Harrelson,* 758 F.2d 1416 (11th Cir.1985); *Roucchio v. Coughlin,* 923 F.Supp. 360 (E.D.N.Y.1996) (finding no inherent liberty interest notwithstanding that plaintiff had been in program for fifteen months and was spending five nights a week at home); *see also Harper,* 64 F.3d at 566 (finding liberty interest in remaining in preparole program but stating that "dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest[ ] ... is the fact of release from incarceration"); *Edwards v. Lockhart,* 908 F.2d 299,

300–01 (8th Cir.1990) (finding liberty interest in remaining in work release program but relying principally on fact that releasee in that case had been "released from institutional life altogether"). *But see Saltzburg v. Fulcomer,* No. 88–4989, 1990 WL 116264, *3–4 (E.D.Pa. Aug.2, 1990) (Shapiro, J.) (holding—in case where plaintiff worked twelve hours per weekday outside facility with fiancé and fiancé's son and spent three weekends per month at fiancé's home—that "there is a constitutional liberty interest in remaining in pre-release program" because removal is similar in effect to parole revocation, causes "major change" in conditions of confinement and works "grievous loss"), *reconsideration denied,* 1988 WL 119505 (E.D.Pa. Nov.4, 1988); *United States Ex. Re. Flores v. Cuyler,* 511 F.Supp. 386 (E.D.Pa.1981) (finding that prisoner was entitled to due process when he was suspended from pre-release status because suspension resulted in loss of eligibility for home furloughs, and "[t]hat eligibility represented some quantum of liberty, and though the quantum may have been small, it was entitled to due process protection").

### B. *State–Created Protected Liberty Interest*

█ Plaintiff argues that "[e]ven if the VOA program is not sufficiently like parole to come under the rubric of Young, Asquith retained a sufficient [State-created] liberty interest under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) to warrant the protections of the due process clause." Plaintiff's Brief in Support of Motion for Summary Judgment at 17.

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). *Sandin v. Conner* worked a major change in the landscape of State-created liberty interest jurisprudence.

**10.** In *Young,* the Court sent strong signals that Harper's preparole status would not have been equivalent to parole if it had been the case that his status could be affected by an extrinsic force such as the Governor's discretionary power to revoke preparole status. *Young,* 520 U.S. 143, 117 S.Ct. 1148, 1153 & nn. 2–3, 137 L.Ed.2d 270 (1997).

In *Sandin*, Conner claimed he had a protected liberty interest in not being confined to administrative segregation. The Court reexamined the inquiry a court must undertake in analyzing Due Process claims in the prison setting. It noted that in previous cases "the Court ha[d] wrestled with the language of intricate, often rather routine prison guidelines to determine whether mandatory language and substantive predicates created an enforceable expectation that the state would produce a particular outcome with respect to the prisoner's conditions of confinement." 515 U.S. at 480–81. This approach had "come to full fruition in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), where

> [the Court] asked whether the State had gone beyond issuing mere procedural guidelines and had used language of an unmistakably mandatory character such that the incursion on liberty would not occur absent specified substantive predicates.... Finding such mandatory directives in the regulations before it, the Court decided that the State had created a protected liberty interest."

*Sandin*, 515 U.S. at 480 (internal quotes and citation omitted). This methodology had led courts to find liberty interests by drawing negative inferences or implications from mandatory language. *Id.* at 481, 483.

The Court criticized the *Hewitt* approach as one which had "shift[ed] the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation," and which had led prisoners to comb regulations in search of "entitlements" to certain State-conferred "privileges." *Id.* 515 U.S. at 481. The *Sandin* Court "abandon[ed]" the *Hewitt* methodology. *Id.* at 483 n. 5; *see Frey v. Fulcomer*, 132 F.3d 916, 925 n. 7 (3d Cir.1997). In its most oft-quoted passage, the Court then stated that "[State-created liberty] interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483.

The *Sandin* Court offered additional touchstones for identifying State-created liberty interests. The Court announced a return to the standards articulated in *Wolff v. McDonnell* and *Meachum v. Fano*. *Id.* The Court noted that in *Wolff* it had found the liberty interest in good time credits to be of "'real substance.'" *Id.* at 477 (quoting *Wolff*, 418 U.S. at 557); *see also id.* 515 U.S. at 480 (complaining that *Hewitt* methodology had made it unnecessary for inmates to rely on "a showing that they had suffered a 'grievous loss' of liberty retained even after sentenced to terms of imprisonment") (quoting *Morrissey*, 408 U.S. at 481) (internal quotes omitted). The Court observed that in *Meachum*, it had reasoned that a transfer from a medium to a maximum security prison "was 'within the normal limits or range of custody which the conviction has authorized the State to impose.'" *Id.* at 478 (quoting *Meachum*, 427 U.S. at 225). The *Meachum* Court had distinguished *Wolff* by noting that the protected liberty interest in good time credit had been created by State law, whereas no comparable law stripped officials of discretion to transfer prisoners to alternate facilities "'for whatever reason or for no reason at all.'" *Id.* 408 U.S. at 478–79 (quoting *Meachum*, 427 U.S. at 228). Finally, the *Sandin* Court found it significant that the administrative segregation before the Court had not worked a "major disruption" in Conner's life. *Id.* 515 U.S. at 486.

Although the application of *Sandin* in this case is not entirely straightforward, the Third Circuit has provided some guidance. In *Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997) (administrative custody case), the court read *Sandin* as "conclud[ing] that not every state law that confers a right upon an inmate in mandatory language creates a liberty interest . for purposes of the due process clause." *Id.* at 705. The court found that the administrative custody in *Griffin* was not atypical and did not impose a significant hardship relative to the ordinary incidents of prison life. It was within the parameters of the sentence imposed. *Id.* at 708. *Griffin* argued that Pennsylvania regulations gave

him a right to due process before administrative custody could be imposed for more than twenty days. The Third Circuit assumed for purposes of analysis that the regulations had given him that right, but stated:

> The central teaching of *Sandin* is that a state statute or regulation conferring a right is not alone enough to trigger due process. The state law must confer freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* (internal quotes omitted).

It is clear, then, that a court cannot find a State-created liberty interest in the absence of a State law conferring a right. Moreover, a court must examine the seriousness of the restraint or deprivation. The objective, as stated in *Sandin,* is to assess the nature of the interest at stake and the nature of the deprivation. The "atypical and significant hardship" standard is one touchstone, but a court also must consider whether the inmate's interest is of "real substance," such that being deprived of that interest will work a "grievous loss" on the inmate or work a "major disruption" in the conditions of his confinement.

The relative difficulty of applying *Sandin* in this kind of case recently was noted by Judge Pollak. In *Anderson v. Gary,* No. 95–6691, 1995 WL 848700 (E.D.Pa. Dec.21, 1995), Judge Pollak stated that "it is arguable that *Sandin v. Conner* does not bar a claim that the plaintiff has a liberty interest in continued participation in [a work release program]." *Id.* at *2. Judge Pollak relied on a discussion in *Williams v. Moore,* 899 F.Supp. 711 (D.D.C.1995) (considering liberty interest in placement in work furlough program), *appeal dismissed,* No. 95–7242, 1996 WL 680212 (D.C.Cir. Oct.7, 1996). In *Williams,* Judge Friedman stated:

> [W]ork release, like the good time credits protected in *Wolff,* provides substantial benefits such as expanded freedom, earning capacity, training and preparation for community reentry that relate not only to

the terms of confinement itself but to life outside the prison. *Sandin,* by contrast, focused on the day-to-day characteristics of life inside the prison. Since the Court in *Sandin* explicitly instructs courts to examine the nature of the deprivation rather than the language of the regulation, it could be argued that work release, unlike administrative confinement, represents a liberty interest of 'real substance' that creates a cognizable claim under the Due Process Clause.

*Id.* at 713. Judge Pollak did not need to decide the issue, as the posture of the case before him required only that he find the prisoner's claim had some merit.[11] He did note, however, that "most work release programs are a 'species of incarceration' and involve much less freedom than does parole, suggesting that *Sandin* may indeed apply to these programs." *Anderson,* 1995 WL 848700 at *2. This Court agrees that *Sandin* must apply to this case insofar as it commands that a court focus on the nature of the interest at stake before concluding that a State law has given an inmate the right not to be deprived of that interest in the absence of some requisite finding reached after due process has been afforded.

Asquith points out that Judge Lifland recently held that *Sandin* is not applicable in the parole eligibility context. In *Watson v. DiSabato,* 933 F.Supp. 390 (D.N.J.1996), a prisoner alleged that he was wrongfully denied parole. Judge Lifland began by recognizing the settled law that the New Jersey Parole Act creates a sufficient expectation of parole eligibility to entitle prisoners to some due process protections. *Id.* at 392. Judge Lifland concluded, with ample support, that *Sandin* did not disturb the line of cases establishing that a State can create a liberty interest in parole eligibility by enacting parole statutes which create an expectancy of release, because it is an expectancy which relates to the duration of a prisoner's confinement. *Id.* at 393 (citing *Ellis v. District of Columbia,* 84 F.3d 1413, 1418 (D.C.Cir.,

---

11. Judge Friedman also did not need to decide the issue because he found that under pre-*Sandin* law the State law at issue did not contain the kind of explicit mandatory language which would give rise to a protected interest in work furlough. *Id.* at 714.

1996);) [12] *Wilson v. Kelkhoff,* 86 F.3d 1438, 1446 (7th Cir.1996); *Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995) (dictum), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996).

The underlying recognition in *Watson* — and the cases upon which it relies—is that *Sandin* left untouched a narrow range of liberty interests which relates to the duration of a prisoner's confinement. *See Watson,* 933 F.Supp. at 393 (citing *Sandin,* 515 U.S. at 487). This fact is irrelevant here. Whatever Asquith's interests in remaining in the work release program might have been, there is nothing more than speculation on his part that they implicated the duration of his confinement. There has been no evidence presented that continued participation in the program would have hastened Asquith's release, or that his removal from the program would be, or was, considered negatively in his eventual parole determination.[13] The liberty interest here related not to the duration of Asquith's confinement, but to the conditions of his confinement. Therefore, *Watson* is inapposite here.

Before applying the principles of *Sandin* to this case, this Court must consider whether this case is controlled by any pre-*Hewitt* Third Circuit cases. This consideration is required because Sandin rejected only the *Hewitt*-inspired method of finding liberty interests created through the negative implications of mandatory language without regard for the nature of the interest at stake. In *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir. 1980) (en banc), *cert. denied sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), the Third Circuit considered whether a Delaware prisoner had a State-created liberty interest in admission to a work release program and held that he did. A review of the Third Circuit's analysis makes clear that the court focused exclusively on Delaware statutes and prison regulations in holding that there was a State-created protectible liberty interest in admission to

a work release program "where a prisoner meets all eligibility requirements ... and the exercise of prison authorities' discretion is consistent with work release policy." *Id.* at 1005–07. This exclusive focus on State law, with its lack of any explicit consideration of the nature of the interest involved, is the methodology that was rejected in *Sandin.* Therefore, *Winsett* is called into doubt by *Sandin* and does not control this case. *See Browning–Ferris, Inc. v. Manchester Borough,* 936 F.Supp. 241, 247 (M.D.Pa.1996) (stating that Winsett's reasoning is "undermined" by Sandin and its conclusion "highly questionable" in light of *Sandin's* "atypical or significant hardship" standard).

Courts have not reached uniform results on the issue of whether the interest in remaining in a work release program implicates a State-created protected liberty interest. *Dominique v. Weld,* 73 F.3d 1156 (1st Cir.1996), is the leading case finding no State-created liberty interest in continued participation in a work release program. In *Dominique,* an inmate challenged his transfer from a work release program—in which he had been a participant for four years—to a minimum security prison. The First Circuit reviewed *Sandin* and concluded that "the new threshold test articulated in *Sandin* precludes our finding a liberty interest." *Dominique,* 73 F.3d at 1160. The inmate's "transfer to a more secure facility subjected him to conditions no different from those ordinarily experienced by large numbers of other inmates serving their sentences in customary fashion." *Id.* The hardship he experienced was not "atypical." *Id.* The court noted that while "return from the quasi-freedom of work release to the regimentation of life within four walls may be said, relatively speaking, to have been a 'significant' deprivation," it still was not atypical. *Id.* In this vein, the First Circuit noted the Supreme Court's comment that "an inmate's *subjective* expectations are not dispositive of the liberty-interest analysis." *Id.* (citing *Sandin,* 515

---

**12.** Chief Judge Becker cited *Ellis* approvingly in dicta in *Frey v. Fulcomer,* 132 F.3d 916, 924 n. 7 (3d Cir.1997).

**13.** Indeed, a finding that Asquith committed a major violation (i.e., alcohol consumption) could

have affected his tenure in prison—and other aspects of his confinement—and for this very reason he was given a hearing at which he could argue his innocence.

U.S. at 486 n. 9). Finally, the court noted that "open[ing] the door to finding an 'atypical ... restraint' whenever an inmate is moved from one situation to a significantly harsher one that is ... a commonplace aspect of prison existence" would "directly conflict with Sandin's teachings." *Id.* Several courts have reached similar results. *See Callender v. Sioux City Residential Treatment Facility,* 88 F.3d 666 (8th Cir.1996); *Grennier v. Nagle,* 73 F.3d 364 (7th Cir.1995) (unpublished opinion), No. 94–3838, 1995 WL 767897 (7th Cir. Dec.28, 1995), *cert. denied,* 517 U.S. 1173, 116 S.Ct. 1580, 134 L.Ed.2d 677 (1996); *Dudley v. Coombe,* No. 96–1665, 1997 WL 423074 (S.D.N.Y. July 28, 1997); *Duffy v. Selsky,* No. 95–0474, 1996 WL 407225 (S.D.N.Y. July 18, 1996); *Hamilton v. Peters,* 919 F.Supp. 1168, 1172 (N.D.Ill. 1996).[14]

A minority of courts have reached a contrary result. In *Greaves v. New York,* 951 F.Supp. 33 (S.D.N.Y.1996), the court began by considering *Lee v. Governor of N.Y.,* 87 F.3d 55 (2d Cir.1996). In *Lee,* the Second Circuit had held that the liberty interest claim of inmates who had been rendered ineligible for a work release program failed under *Sandin* because the inmates would not suffer an "atypical and significant hardship" because there would be no change or "major disruption" in the inmates' environment. 87 F.3d at 58. The district court in *Greaves* found that the inmate's removal from a work release program which had allowed him to live at home five days per week constituted a major disruption of his life and inflicted an atypical and significant hardship upon him. Therefore, the inmate had a protected liberty interest in remaining in the program. 951 F.Supp. at 35–36.

In *Roucchio v. Coughlin,* 923 F.Supp. 360 (E.D.N.Y.1996), the court began by noting the "jurisprudential uncertainty" created by *Sandin. Id.* at 372. As Justice Ginsburg stated in her Sandin dissent, the majority's opinion leaves "consumers of the Court's work at sea ... to fathom what would constitute an 'atypical, significant deprivation,' and

yet not trigger protection under the Due Process Clause directly." 515 U.S. at 490 (Ginsburg, J., dissenting) (citation omitted). Nonetheless, the district court reasoned that, under *Sandin,* in order for a deprivation to impose an atypical and significant hardship relative to the ordinary incidents of prison life, the deprivation must be inconsistent with the prisoner's sentence in the sense that it is unexpected and works a major disruption in the prisoner's environment. *Roucchio,* 923 F.Supp. at 372. In *Roucchio,* the inmate who was removed from his work release program had been living at home five days per week. The court found that returning him to prison worked a major disruption in his environment and imposed an atypical and significant hardship upon him relative to the ordinary incidents of prison life. *Id.* at 374–75. The court criticized courts which have reached a contrary result, arguing that they "undervalue the extent to which an inmate's environment is disrupted through the revocation of a conditional freedom outside the prison walls." *Id.* at 375 n. 6.

In *Quartararo v. Catterson,* 917 F.Supp. 919 (E.D.N.Y.1996), the court stated that "the removal of a prisoner from a work release program in which he has been gainfully employed imposes an atypical, significant hardship upon the prisoner relative to the ordinary incidents of prison life, and constitutes a substantial disruption of his environment." *Id.* at 940. Therefore, the court found that "a liberty interest [was] implicated through [the inmate's] removal from a work release program." *Id.*

This Court will follow *Dominique* because its reasoning and outcome harmonize with *Sandin* better than the reasoning and outcome in the contrary cases. *Dominique* suggests that an inmate's subjective expectations concerning the conditions of his confinement, while relevant, should not be dispositive. Disappointed expectations are, after all, an ordinary incident of prison life. In addition, in both *Greaves* and *Roucchio,* the plaintiff inmates had been living outside of institution-

---

14. Plaintiff's suggestion that *Dominique* is inapposite in light of the Supreme Court's decision in *Young v. Harper* is meritless. As discussed, *Young* concerned a preparole program, different

from parole in name only, and held that the preparolee there had a liberty interest arising directly under the Due Process Clause.

al life five days per week. Their deprivations were much closer to being losses of "the core values of unqualified liberty" than Asquith's deprivation. Asquith's condition was, as Judge Pollak has phrased it, "a species of incarceration."

Whatever else might be said about *Sandin*, it clearly aimed to narrow the range of successful prisoner liberty interest claims so as not to interfere with the needs of prison officials in overseeing a large inmate population and running a variety of programs and facilities. The result Asquith seeks appears to be at odds with this core objective of *Sandin*. Community work release programs involve placing convicted criminals in the community. The inherent potential risks to the public associated with such programs are obvious. In addition, the DOC is charged with ensuring the success and public acceptance of work release programs. One bad incident can create a substantial backlash. With these risks in mind, DOC officials must make decisions about work release program participation which involve subtle considerations and analyses. For example, that an inmate, though perhaps not intoxicated, was perceived to be acting strangely by two halfway house employees and one prison officer might itself be a consideration respecting that inmate's suitability for community release. That an inmate had any conflict with halfway house personnel by itself is relevant. In short, proof which would be insufficient to suggest a finding that a major prison regulation was violated might well be adequate to justify removal from a work release program. Such subtle determinations and considerations are built into the administration of work release programs and are ill-suited to due process review. To subject them to such review would interfere with the complicated process of making sensitive determinations about inmates' proper placement.

Finally, even if Asquith could show that his removal from the work release program worked an atypical and significant hardship relative to the ordinary incidents of prison life, he still could not show that New Jersey law has used the kind of mandatory or discretion-narrowing language which would vest in him the right not to be removed in the absence of a finding of some substantive predicate, such as an alcohol violation. First, as observed above, New Jersey's community work release regulations gave the Commissioner discretion to terminate a work release agreement for "sufficient" reason. Second, the regulations stated that under New Jersey law the Commissioner could transfer an inmate from one site of confinement to another "at any time." N.J.A.C. 10A:20–4.2. Third, a work release participant could be removed because of problems adjusting to the program—a provision with potentially broad discretionary reach. Fourth, significantly, N.J.A.C. 10A:20–4.21(d) provided that "[m]ajor disciplinary *charges* shall result in the immediate transfer of the inmate to a correctional facility." (emphasis added). The regulations said nothing about whether an inmate could or should be returned to his program upon being cleared of the charge. Thus, there was a strong indication that work releasees could be terminated from program participation if they were *charged* with a major infraction.

There was no provision stating, for example, that "a work release inmate will be terminated from work release *only* if he has been found to have committed a listed major violation," or that "a work release inmate is entitled to a hearing to determine if he has committed a major violation before it is determined that he will not be returned to his program," or any other provision to that effect. Ultimately, then, Asquith would have this Court hold that, since New Jersey listed some substantive predicates for terminating an inmate's work release program participation (e.g., use of alcohol), the Department of Corrections could terminate his participation only if the existence of one of these predicates was established in accordance with due process. This negative implication mode of reasoning is precisely the type that was rejected in *Sandin*.

## C. *Asquith's Missing Property*

Asquith alleges that certain property he left behind at VOA was not returned to him despite his letters to VOA, social workers, "the warden" and "people at Bayside." Some of his work tools apparently were left

at Cramer Hill Apartments where he had been working. In his deposition he testified that his friend at VOA had informed him that unspecified VOA personnel had taken his property, thrown in it bags and dumped all over the floors at VOA.[15] Dep. of Asquith at 75–76. About a month after being sent to Bayside, Asquith received a box containing some of his possessions. Still missing, he avers, are a "a lot of things," including a pair of earrings, photographs and clothes.[16]

There is no cognizable due process claim for a deprivation of property flowing from a mere lack of due care. *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Where there has been a reckless or intentional deprivation of property, a due process claim will lie only if the State does not afford an adequate post-deprivation remedy, unless the property loss could have been avoided by a pre-deprivation hearing. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Asquith's only potentially recognizable due process claim is that the deliberate, intentional or willful acts of VOA and DOC personnel deprived him of his property. A pre-deprivation hearing was impractical because the State could not have foreseen that State actors would commit the "random and unauthorized" acts Asquith alleges were committed. *See Hudson*, 468 U.S. at 532; *Parratt*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420. The question is whether Asquith has a State post-deprivation remedy which will compensate him for any loss he might be able to demonstrate.

Asquith has not alleged a lack of an adequate post-deprivation remedy, let alone proved such a lack. He has not offered any reason why he could not obtain an adequate

remedy in an action brought under the New Jersey Tort Claims Act or in a common law tort action. *See Holman v. Hilton*, 712 F.2d 854, 857 (3d Cir.1983). He has presented no facts permitting this Court to analyze the issue independently in the event that it were inclined to do so. For example, this Court does not know what property is missing, what exactly Asquith alleges was done with his property and who is alleged to have done it. The authorities support dismissal of his § 1983 claim in these circumstances. *See Vicory v. Walton*, 721 F.2d 1062, 1065 (6th Cir.1983), *cert. denied*, 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984); *Robinson v. United States*, No. 94–1037, 1995 WL 564187, *3 (D.D.C. Sep.14, 1995); *Hall v. California Dep't of Corrections*, 835 F.Supp. 522 527 n. 9 (N.D.Cal.1993) (dictum); *Guyer v. Crampton*, No. 86–0076, 1986 WL 2784, *1 (E.D.Pa. Feb.27, 1986). Accordingly, this Court will dismiss Asquith's § 1983 claim that he was deprived of certain personal property without due process of law.

## IV. CONCLUSION

Asquith had no protected liberty interest in remaining in his community work release program. He cannot demonstrate a violation of his constitutional right to due process. This Court need not reach the VOA and Savko's qualified immunity claim, or the DOC defendants' claim that they should be dismissed from the case because they had no personal involvement in the complained-of events. This Court will grant defendants' motions for summary judgment as to Asquith's § 1983 claim that he was terminated from his work release program in violation of his due process rights and dismiss that claim. Asquith's claim that he was deprived of certain personal property in violation of the constitution also will be dismissed.

---

**15.** This testimony appears to be inadmissible hearsay. It is mentioned here only insofar as it helps to give a fuller picture of Asquith's complaint about lost and mishandled property.

**16.** New Jersey's community release program regulations provided that neither the DOC nor a contracting agency such as VOA were responsible for an inmate's personal property. N.J.A.C. 10A:20–4.35(a). Inmates were required to make arrangements to have valuable and excessive property sent home before transferring to a halfway house. *Id.* 10A:20–4.35(c); *see* Release Agreement Program Application at 7.