112 F.3d 703
 Jerome GRIFFIN, Appellant,
v.
Don VAUGHN; Hugh Owens; B.K. Smith; R. Johnson; Joseph
Chesney; Tim Henry; Joseph D. Lehman; Glenn D. Hopey;
Michael Barone; D. Searfoss; M. Lucas; Arthur Auxer;
Jeffrey Beard; and John Palakovich, Defendants, are all
sued in their individual and official capacities.
 No. 96-1023.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 6, 1997.
Decided May 5, 1997.
 
 Doron A. Henkin (argued), Toll, Ebby, Langer & Marvin, Philadelphia, PA, for Appellant.
 Thomas W. Corbett, Jr., Attorney General, Randall J. Henzes (argued), Deputy Attorney General, Calvin R. Koons, Sr., Deputy Attorney General, John G. Knorr, III, Chief, Deputy Attorney General, Philadelphia, PA for Appellees.
 Before: STAPLETON and MANSMANN, Circuit Judges, RESTANI,* Judge.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Jerome Griffin alleges that his constitutional rights were violated by the defendant prison officials when he was held in administrative custody for fifteen months. He claims violations of procedural due process, the eighth amendment, and equal protection.[1] For the reasons set forth below, we will affirm the judgment of the district court.
 
 I. Background
 
 2
 In 1992, a female prison guard at State Correctional Institute (SCI) Graterford was beaten and raped by a male prisoner. Griffin was suspected of committing the rape and was placed in administrative custody without a hearing pending an investigation of the incident. He was given written notice of the reason for his transfer to administrative custody. The notice stated that he was under investigation for a violation of prison rules and regulations, and that there was a need for increased control pending disposition of the charge.
 
 
 3
 Subsequently, Griffin was transferred to prisons at Frackville and Camp Hill, where he remained in administrative custody. While at SCI Frackville, Griffin received monthly reviews, during which the Program Review Committee (PRC) discussed his confinement with him, reviewed his behavior, and attempted to answer his questions. Griffin remained in administrative custody for fifteen months.
 
 
 4
 After dismissing the complaint with respect to some of the defendants on the ground that Griffin failed to allege their participation or acquiescence in the alleged violation of Griffin's constitutional rights, the district court granted summary judgment in favor of the remaining defendants.
 
 II. The Due Process Claim
 A.
 
 5
 Like the district court, we conclude that Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), controls the disposition of Griffin's procedural due process claim. In that case, Conner, after an episode following a strip search, was found guilty of violating prison rules and was sentenced to 30 days' disciplinary segregation in the Special Holding Unit. At the disciplinary hearing, the Disciplinary Committee refused Conner's request to present witnesses because the witnesses were unavailable "due to move to medium facility and being short staffed on modules." 515 U.S. at ----, 115 S.Ct. at 2296. Conner subsequently brought a civil rights action claiming that this refusal violated his right to procedural due process.
 
 
 6
 The Supreme Court began its analysis by explaining that the due process clause was applicable only if Conner had been deprived of a liberty or property interest. Since Conner maintained that he had been deprived of liberty created by state law, the Court then reviewed its case law concerning the circumstances under which state law can create a liberty interest in a prison context. It ultimately concluded that not every state law that confers a right upon an inmate in mandatory language creates a liberty interest for purposes of the due process clause. It held:
 
 
 7
 [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.
 
 
 8
 Sandin, 515 U.S. at ----, 115 S.Ct. at 2300 (citations omitted).
 
 
 9
 Due process protection for a state created liberty interest is thus limited to those situations where deprivation of that interest "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Moreover, the baseline for determining what is "atypical and significant"--the "ordinary incidents of prison life"--is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law. Of particular importance in Conner's case, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." ID. AT ----, 115 S.CT. AT 2301.[2]
 
 
 10
 The Court held that the conditions Conner experienced, while concededly imposed for punitive reasons, did not present "a dramatic departure from the basic conditions of [his] indeterminate sentence" because those conditions were virtually identical to the conditions imposed on inmates in administrative segregation and protective custody. Id. at ----, 115 S.Ct. at 2301. As the Court explained:
 
 
 11
 We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.... Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at[the institution] involve significant amounts of "lockdown" time even for inmates in the general population.
 
 
 12
 Id. at ----, 115 S.Ct. at 2301 (footnote omitted).
 
 
 13
 Thus, based on a comparison of the circumstances of those inmates, like Conner, in disciplinary segregation and the circumstance of those inmates elsewhere in the system, including those in administrative segregation and protective custody, the Court concluded that Conner had not been subjected to "atypical and significant hardship." Accordingly, he had no state created liberty interest and the refusal to allow him to call his witnesses was not a violation of procedural due process.
 
 B.
 
 14
 Applying the precepts of Sandin to the circumstances before us, we conclude that the conditions experienced by Griffin in administrative custody did not impose on him "atypical and significant hardship," that he was thus deprived of no state created liberty interest, and that the failure to give him a hearing prior to his transfer to administrative custody was not a violation of the procedural due process guaranteed by the United States Constitution.
 
 
 15
 The relevant Pennsylvania regulations define administrative custody as a "status of confinement for nondisciplinary reasons which provides closer supervision, control, and protection than is provided in general population." App. at 172. The following conditions apply in administrative custody:
 
 
 16
 1. Smoking will be limited to two packs of cigarettes or their equivalent per week.
 
 
 17
 2. There will be no radios, televisions, telephone calls (except emergency or legal), personal property or commissary except writing materials.
 
 
 18
 3. Non-legal visits of one per week will be allowed under the appropriate security procedures. PRC to determine the security of visits.
 
 
 19
 4. They will be allowed legal materials that may be contained in one records center box. Any additional legal materials will be stored and made available within a reasonable time period upon written request or an even exchange basis.
 
 
 20
 5. They will be allowed incoming paid per DC-ADM 803. However, no books other than legal materials and a personal Bible, Holy Koran or other religious equivalent will be permitted. Inmates will be provided access to the institution law library by requesting legal materials in accordance with local policy. Leisure reading material may be requested on a weekly basis from the library.
 
 
 21
 6. Inmates in administrative custody status will be provided with an RHU jumpsuit, footwear, and basic issue toilet articles. Two (2) pairs of personal undergarments are permitted. No other personal property is permitted. Outer wear for exercise will be provided as needed.
 
 
 22
 7. Exercise will be one (1) hour per day, five (5) days per week, and inmates shall be permitted three (3) showers and three (3) shaves per week.
 
 
 23
 PRC or security level 5 unit management teams may add to the above privileges based on a individual's need, on safety and security, and on behavioral progress of the inmate. Specifically, with the approval of PRC, inmates may be granted increased smoking and visiting privileges, radios, televisions, telephone calls, commissary, access to educational books and materials, and any other general population privileges with the following exceptions: freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, the use of items specifically found by the Program Review Committee or security level 5 unit management team to be a security hazard, and commissary special order privileges. These extra privileges once given may also be removed by the Program Review Committee or security level 5 unit management team based on an individual's behavior and on the security of the institution.
 
 
 24
 App. at 177-178.
 
 
 25
 "Inmates in administrative custody can be released to population by the Program Review Committee or the Superintendent at any time during their confinement.... Specific items [to] be evaluated in making the decision whether to continue or release an inmate from administrative custody [are]:
 
 
 26
 a. Time in RHU.
 
 
 27
 b. Number, type and frequency of misconducts
 
 
 28
 c. Continued public or institution risk
 
 
 29
 d. Safety of the inmate, other inmates and staff
 
 
 30
 e. Behavior in RHU including sanitation, personal hygiene and grooming, response to authority, response to other inmates and response to verbal and written orders.
 
 
 31
 f. Recommendation of RHU and treatment staff."
 
 
 32
 App. at 176.
 
 
 33
 Most importantly for present purposes, inmates who are the subject of an investigation are not the only ones in administrative custody. Under the regulations, an inmate "may be transferred from general population to administrative custody by order of the shift commander for the following reasons:
 
 
 34
 a. The inmate is a danger to some person(s) in the institution who cannot be protected by alternate measures;
 
 
 35
 b. The inmate is a danger to himself/herself;
 
 
 36
 c. The inmate is suspected of being or is the instigator of a disturbance;
 
 
 37
 d. Placement in general population would endanger the inmate's safety or welfare when it is not possible to protect him/her by other means;
 
 
 38
 e. The inmate would pose an escape risk in a less secure status;
 
 
 39
 f. The inmate has been charged with or is under investigation for a violation of institution rules and there is a need for increased control pending disposition of charges or completion of the investigations.
 
 
 40
 g. The inmate has requested and been granted self-confinement;
 
 
 41
 h. The inmate is being held temporarily for another authority and is not classified for the general population of the holding institution;
 
 
 42
 i. No records are available to determine the inmate's custody level;
 
 
 43
 j. The inmate is a phase I capital case."
 
 
 44
 App. at 64-65.
 
 
 45
 It is thus apparent that in the penal system to which Griffin was committed with due process of law, it is not extraordinary for inmates in a myriad of circumstances to find themselves exposed to the conditions to which Griffin was subjected. It is also apparent that it is not atypical for inmates to be exposed to those conditions, like Griffin, for a substantial period of time. Given the considerations that lead to transfers to administrative custody of inmates at risk from others, inmates at risk from themselves, and inmates deemed to be security risks, etc., one can conclude with confidence that stays of many months are not uncommon.
 
 
 46
 For these reasons, we believe that exposure to the conditions of administrative custody for periods as long as 15 months "falls within the expected parameters of the sentence imposed [on him] by a court of law." It necessarily follows, in our view, that Griffin's commitment to and confinement in administrative custody did not deprive him of a liberty interest and that he was not entitled to procedural due process protection.
 
 C.
 
 47
 Griffin's argument to the contrary centers upon the following provision of the applicable regulations:
 
 
 48
 Confinement in Administrative Custody for investigative purposes pursuant to Section VI.A.1.f. of this directive shall not exceed 10 calendar days. The Superintendent may approve one additional 10 day investigative confinement period if the investigation has not been completed. The reason for the continuation shall be documented and a copy provided to the inmate. Following the 20 day period the inmate must be charged with a misconduct and a subsequent hearing held within six days if the inmate is not to be released to population.
 
 
 49
 App. at 174.
 
 
 50
 The effect of this provision under Pennsylvania state law is not altogether clear given the penultimate section of the regulations that provides as follows:
 
 
 51
 This directive sets out policy and procedure. It does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. The directive should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the directives and policies of the Department of Corrections.
 
 
 52
 App. at 178.
 
 
 53
 We may assume, for present purposes, however, that the regulations confer upon an inmate in Griffin's position a right to be released from administrative custody to general population after 20 days in the absence of a misconduct charge and that Griffin had or has some remedy in a state court for the violation of that right. It does not follow, however, that Griffin had a state created liberty interest that triggered federal procedural due process. The central teaching of Sandin is that a state statute or regulation conferring a right is not alone enough to trigger due process. The state law must confer "freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at ----, 115 S.Ct. at 2300. This Griffin's regulation does not do.
 
 
 54
 Griffin also stresses that he could have been held indefinitely without a hearing on whether he was the perpetrator of the alleged rape and that this would necessarily have violated his federal procedural due process rights. We have no occasion to resolve that issue here, however. If an inmate is committed for an atypical period of time to undesirable conditions in violation of state law, that is clearly a factor to be considered in determining whether he has been subjected to atypical and significant hardship and, accordingly, whether due process protection has been triggered. But, as we have explained, Griffin was neither committed nor confined to administrative custody for an atypical period of time.[3]
 
 
 55
 We find support for the conclusions we have reached in decisions from two other courts of appeals. See Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir.1996) (holding that administrative confinement, without more, does not deprive inmates of a constitutionally cognizable liberty interest); Taylor v. Reynolds, 76 F.3d 380 (6th Cir.1996) (finding that administrative segregation is not an atypical and significant deprivation).
 
 III. The Eighth Amendment Claim
 
 56
 Griffin also appeals the district court's grant of summary judgment with respect to the claim that his confinement was cruel and unusual punishment in violation of the Eighth Amendment. Specifically, Griffin argues that his prolonged administrative segregation inflicted an additional punishment without basis, which violated the Eighth Amendment. We disagree.
 
 
 57
 The Eighth Amendment prohibits any punishment which violates civilized standards of humanity and decency. Young v. Quinlan, 960 F.2d 351, 359 (3d Cir.1992). To prove a violation of the Eighth Amendment, an inmate must show that he has been deprived of "the minimal civilized measure of life's necessities." Id. This includes proving that the deprivation suffered was sufficiently serious, and that a prison official acted with deliberate indifference in subjecting him to that deprivation. Id. at 361.
 
 
 58
 As the district court properly recognized, Griffin presented no evidence that he was denied basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety. The sole evidence regarding the conditions of Griffin's confinement is the regulation we have previously quoted concerning conditions in administrative custody. Those conditions clearly do not involve a deprivation of any basic human need. Because Griffin failed to raise a genuine issue of material fact as to whether his confinement was cruel and unusual punishment, we agree with the district court's decision on this claim.
 
 IV. The Equal Protection Claim
 
 59
 Griffin also claims that he was denied equal protection because the prison's classification scheme allows it to confine prisoners under investigation for misconduct for longer terms than prisoners found guilty of misconduct. There is, however, the required rational basis for this alleged disparity. An inmate classified to administrative custody because of a need for "increased control," as was Griffin, may reasonably be required to remain there as long as that need continues. This is hardly inconsistent with the fact that an inmate being punished for misconduct may remain in disciplinary confinement for a shorter period of time.
 
 
 60
 We find no equal protection violation.
 
 V.
 
 61
 We will affirm the judgment of the district court.
 
 
 
 *
 Hon. Jane A. Restani, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 Additionally, Griffin asks that we review the district court's refusal to appoint counsel and his motion to this court for leave to amend the complaint. We find no abuse of discretion in either instance
 
 
 [2]
 One court of appeals has suggested that the baseline for determining "atypical and significant" are the conditions in the general population in the inmate's prison. See Keenan v. Hall, 83 F.3d 1083, 1088 (9th Cir. 1996). We do not so read Sandin, not only because the Court looked in deciding the case to the range of conditions a sentenced inmate would reasonably expect to encounter, but also because it expressly reaffirmed its decision in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). That case held that procedural due process was not required when an inmate was transferred from a medium security to a maximum security prison. If "atypical and significant" were to be determined by comparing the conditions the particular inmate was subjected to before and after the transfer causing the alleged deprivation, one would expect a transfer from medium to maximum security to require procedural due process
 
 
 [3]
 The fact that Pennsylvania regulations provide for hearings after transfer to administrative custody is not relevant to a determination of whether federal procedural due process is required. See Hewitt v. Helms, 459 U.S. 460, 470, 103 S.Ct. 864, 870-71, 74 L.Ed.2d 675 (1983). (The mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation does not indicate the existence of a protected liberty interest.). The process afforded by state law is not relevant in determining whether there is a state created right that triggers due process protection. Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice, the State does not create an independent substantive right.")