

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-11-2002

# Smith v. Mensinger

Precedential or Non-Precedential: Precedential

Docket No. 99-1382

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Smith v. Mensinger" (2002). *2002 Decisions.* Paper 343.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/343

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed June 11, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1382

CARL M. SMITH,

Appellant

v.

ROBIN MENSINGER; DAVID NOVITSKY; JEROME
PAULUKONIS; MARY CANINO; PAUL BURGARD; MARTIN
DRAGOVICH, JEFFREY YURKIEWICZ, PAUL
ANDROSHICK, BERNARD MCCOLE, JAMES ZUBRIS, and
RAYMOND JONES

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Civil No. 97-CV-03613
District Judge: Hon. Eduardo C. Robreno

Argued: July 31, 2001

Before: BECKER, Chief Judge, and McKEE and
WEIS, Circuit Judges.

(Opinion filed: June 11, 2002)

        DEENA J. SCHNEIDER, ESQ. (Argued)
        MATTHEW B. HOLMWOOD, ESQ.
        Schnader Harrison Segal &
         Lewis LLP
        1600 Market Street, Suite 3600
        Philadelphia, PA 19103-7286
        Attorneys for Appellant


        CALVIN R. KOONS, ESQ. (Argued)
        JOHN G. KNORR, III, ESQ.
        Office of Attorney General
        Appellate Litigation Section
        15th Floor, Strawberry Square
        Harrisburg, PA 17120
        Attorneys for Appellees

OPINION OF THE COURT

McKEE, Circuit Judge.

Carl M. Smith, an inmate at the Pennsylvania State
Correctional Facility at Frackville ("SCI-Frackville") filed this
civil rights action under 42 U.S.C. S 1983 alleging that
certain corrections officers and prison employees denied

him due process of law and/or violated his Eighth Amendment right to be free from cruel and unusual punishment. The district court dismissed Smith's due process claims against some of the defendants under FED. R. CIV. P. 12(b)(6), but Smith was allowed to proceed on his Eighth Amendment claims. The court subsequently granted summary judgment against Smith and in favor of the defendants on all of Smith's claims. For the reasons that follow, we will reverse in part and affirm in part, and remand for further proceedings consistent with this opinion.

I. Background

A. The Misconduct Reports

Sometime during the morning of June 3, 1995, Corrections Officer Robin Mensinger issued a misconduct report citing Smith with refusing to obey an order to return to his cell after cell cleanup, and for using foul language towards a corrections officer. Later that afternoon, Mensinger cited Smith in a second misconduct report for allegedly punching her in the eye. That evening, Sergeant Paulukonis issued a third misconduct report against Smith. That report cited Smith for assaulting corrections officers

2

as they were escorting him to the Restricted Housing Unit ("RHU").

Smith denies that he assaulted Mensinger or struggled with other corrections officers later that evening. He admits that he did not return to his cell when Mensinger requested him to, but claims that he only refused because his cell was still wet. According to Smith, Mensinger was drunk and out of control when she issued the first misconduct report. He claims that as he was leaving his cell during an organized prisoner movement later that day, he heard a whistle blow and looked up to see Mensinger pointing at him. A few seconds later, Corrections Officers Jones and Yoder purportedly arrived on the cell block. Smith claims that Mensinger told the corrections officers that Smith had punched her in the eye. Smith maintains that Yoder then handcuffed him behind his back, and walked him to a bench where Smith was ordered to sit down. According to Smith, other corrections officers (including Androshick, Zubris and McCole) entered the area a few minutes later. The officers then purportedly grabbed Smith by both arms and followed Corrections Officer Novitsky to the Unit Manager's Office. There, Smith claims that Yurkiewicz and Jones joined the group and Yoder left.

Once inside the Unit Manager's Office, the officers allegedly rammed Smith's head into walls and cabinets and knocked him to the floor. He claims that while he was on the floor, Yurkiewicz kicked and punched him, and Novitsky "pulled him to his feet, pushed him against the wall, punched him in the stomach, and choked him with

both hands. . . ." Brief for Appellant at 15. Smith alleges that Paulukonis saw the beating, but did nothing to intervene or restore order.

Smith further alleges that after the beating in the Unit Manager's office, two or three guards took him to the RHU where Yurkiewicz placed him face-down on a bench, tightened the handcuffs as much as possible, and hit him on the back of the head while verbally threatening him and showering him with racial epithets.

B. Smith's Injuries

Smith alleges that his head was bleeding and the beating also resulted in pain in his ribs, ears, and right eye. His

3

ribs were purportedly red and bruised and remained sore for a couple of weeks after the beating. Smith was seen by the medical staff each of the following two days, but according to the medical records, he was treated only for chronic asthma. In his deposition, Smith stated that a doctor gave him ice for his ribs and told him to keep a wet towel against them the day after the incident. However, a report prepared by the defendants' medical expert states that an examination of Smith soon after the incident failed to disclose any wounds, marks, or bruises near his rib cage or anywhere else.

C. The Aftermath of the June 3, 1995 Incident

On June 4, 1995, Pennsylvania State Trooper Leo Luciani interviewed Smith regarding Smith's alleged attack of Mensinger. During that interview Luciani purportedly showed Smith a photograph of Mensinger that Smith claims supports his claim that he never hit her in the face. Nevertheless, the Commonwealth filed a criminal complaint against Smith based upon Mensinger's allegation, and Luciani testified for the prosecution at the preliminary hearing on those charges. The charges included assault, assault by a prisoner, and retaliation for past official action. The Commonwealth subsequently added the charge of disorderly conduct, and Smith eventually pled nolo contendere to that charge. The trial court then granted the Commonwealth's request to nol pros the remaining charges.

Meanwhile, a hearing on the three misconduct reports was scheduled at SCI-Frackville, and Smith completed a "Request for Representation" form listing two inmates he wanted to call as witnesses at that hearing. He claims that those two inmates would have testified that he did not strike Mensinger as she had charged. When Smith arrived at the hearing, Hearing Officer Mary Canino informed him that his witnesses were not available and that the hearing would be delayed until that afternoon.[1]  However, the

_____

1. Smith contends that his witnesses were not available because they

were waiting for their own hearings on misconduct notices which "the drunk and outer [sic] control" Mensinger had also issued to them on June 3, 1995. App. at 61.

hearing did not proceed that afternoon, and Smith was transferred to the State Correctional Institution at Mahoney ("SCI-Mahoney") the next day.

Smith's misconduct hearing reconvened at SCI-Mahoney a few days later. However, since Smith's witnesses remained at SCI-Frackville, Canino offered to continue the hearing to afford Smith an opportunity to submit written statements from his witnesses. Smith refused the offer because he did not trust that prison officials would obtain accurate statements. Rather than submit those statements, Smith sought a continuance in order to attempt to recover the allegedly exculpatory photograph that Trooper Luciani had shown him. Canino denied Smith's request for a continuance, and Smith's hearing on the misconduct reports proceeded without his witnesses.

Canino credited the testimony against Smith, and found Smith guilty of the conduct charged in all three misconduct reports. He received seven months disciplinary confinement for assaulting Mensinger and for resisting the officers who were escorting him to the RHU. Canino also ordered that Smith's prison account be assessed for "medical and other expenses" to pay for contact lenses for Officer Mensinger even though no evidence of any such expenses had been produced at the hearing. App. at 63. Accordingly, $165.00 was deducted from Smith's inmate account. Smith challenged that action by filing a grievance in which he complained that there was insufficient evidence to debit his account to buy Mensinger lenses. He also unsuccessfully appealed to the Program Review Committee, and to Superintendent Dragovich.

II. Procedural History

On May 23, 1997, Smith filed the instant pro se civil rights action under 42 U.S.C. S 1983 against Corrections Officers Mensinger, Novitsky, and Paulukonis; as well as Hearing Officer Canino, and Business Manager Burgard. The defendants were each sued individually and in their official capacity. Smith later joined Corrections Officers Yurkiewicz, Androshick, McCole, Zubris, and Jones as well as Superintendent Dragovich.

Smith claimed that several corrections officers used excessive force during the June 3 incident, and that they thereafter falsified reports regarding that incident in order to cover up their use of excessive force. Smith also claimed that Canino violated his due process rights by improperly assessing his inmate account, and that Burgard and

Dragovich did not adequately investigate his grievance on appeal.

Although the district court granted Smith's request to amend his Complaint to join Dragovich as a defendant, the court later dismissed the claim against Dragovich as well as Smith's claim against unknown defendant, "John Doe." Mensinger, Paulukonis, Canino, and Burgard thereafter moved to dismiss Smith's claims against them pursuant to FED. R. CIV. P. 12(b)(6). The district court granted that motion. In an unreported opinion, Smith v. Luciani, Nos. CIV.A. 97-3037, CIV.A. 97-3613, 1998 WL 151803 (E.D. Pa. March 31, 1998) (hereinafter "Smith I"), the district court explained that since Smith did not have a liberty interest in remaining in the general prison population, he could not establish a due process claim based upon being placed in disciplinary custody. The court also dismissed Smith's claim against Mensinger based in part upon its belief that the claim constituted an improper collateral attack on Smith's disorderly conduct conviction.

The district court allowed Smith to proceed against the remaining corrections officers on his Eighth Amendment claim, but later granted defendants' motion for summary judgment, dismissing that claim, as well. In a second unreported opinion, Smith v. Mensinger, No. CIV.A. 97-3613, 1999 WL 178539 (E.D. Pa. March 31, 1999) (hereinafter "Smith II"), the court concluded that Smith could not prevail under the Eighth Amendment because the minimal nature of his injuries established that any force that may have been used against him must have been de minimis and therefore insufficient to constitute an Eighth Amendment violation. The court also concluded that whatever force the corrections officers had used was justified by Smith's assault of Mensinger, and the fact that he struggled with the other corrections officers. The court did note that Smith denied assaulting Mensinger and

6

struggling with corrections officers. However, the court refused to credit that denial because Smith offered nothing to support it, and the hearing officer had found him guilty of the charged misconduct. This appeal followed. 2

III. Discussion

Smith argues the district court erred in dismissing both his due process claim, and his Eighth Amendment claim. In addressing Smith's challenge to the dismissal of his Eighth Amendment claim, we must first decide if he can prevail despite the de minimis nature of his injuries. If we decide that he can, we must then decide if a corrections officer (Paulukonis) can be found liable under the Eighth Amendment "merely" because he failed to intervene in the beating allegedly administered by his fellow corrections officers.3

A. Standard of Review

In reviewing a grant of summary judgment, we must view the facts in the light most favorable to the non-moving party. See Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

_____

2. The parties have since successfully mediated the claims arising from the debit of Smith's account. Accordingly, they are not before us.

3. Smith alleges that he was beaten on June 3, 1995, and he filed suit May 23, 1997. The Prison Litigation Reform Act ("PLRA") became effective on April 26, 1996, before Smith sued. The PLRA requires that inmates exhaust claims challenging prison conditions before filing suit under S 1983. See Ghana v. Holland, 226 F.3d 175, (3d Cir. 2000). Smith's Eighth Amendment claim is subject to that requirement. See Booth v. Churner, 532 U.S. 731, 741 (2001). However, exhaustion is an affirmative defense which can be waived if not properly preserved by a defendant. See Ray v. Kertes, 285 F.3d 287 (3d. Cir. 2002). Defendants here have not raised any issues relating to exhaustion. Accordingly, even assuming that any such issue exists here, it has clearly been waived and we therefore need not address whether Smith has properly exhausted under the PLRA.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6), on the other hand, should not be granted unless it appears that the plaintiff can prove no set of facts that would entitle him/her to relief. See Conley v. Gibson, 355 U.S. 41, 45-6 (1957). In undertaking that analysis, we must construe complaints of pro se litigants liberally. See Zilich v. Lucht, 981 F.2d 694, 694 (3d Cir. 1992). The issue of an officer's duty to intervene presents a question of law, which we review de novo. See Holland v. New Jersey Dep't of Corrections, 246 F.3d 267, 281 (3d Cir. 2001) (stating that questions of law are reviewed de novo).

We will first address Smith's Eighth Amendment claims and then examine his due process claim.

B. The Eighth Amendment Claim Based Upon Excessive Force

The district court correctly noted that prison guards who maliciously and sadistically use force against an inmate violate "contemporary standards of decency even if the resulting injuries are not significant." Smith II, 1999 WL 178539, at *3 (internal quotations omitted). However, after noting that Smith could establish an Eighth Amendment violation even absent evidence of serious physical injuries, the district court then focused exclusively on the severity of Smith's injuries in denying his claim. The court stated:

> Even assuming that plaintiff could show that
> defendants acted with the requisite state of mind, the

Court concludes that the alleged wrongdoing by defendants was not objectively harmful enough to establish a constitutional violation. Initially, the Court notes that the injuries suffered by plaintiff were relatively minor.

. . . .

Additionally, accepting as true plaintiff 's version of the facts, including being handcuffed, punched, kicked, and thrown into cabinets and walls, and given the slight injuries suffered by plaintiff, the Court finds that the incident between plaintiff and defendants involved a de minimis use of force that was not repugnant to the conscience of mankind.

8

Id. at *4. Thus, although the court acknowledged that the absence of severe injuries did not preclude Smith's Eighth Amendment claim as a matter of law, the court concluded that the evidentiary value of the absence of injuries was too compelling to ignore. See id. Citing Smith's alleged attack on Mensinger, the court also noted that "the record shows that defendants reasonably perceived plaintiff to be a threat and the need for application of force was apparent." Id. at *5.

We begin our analysis of that ruling with the Supreme Court's decision in Hudson v. McMillan, 503 U.S. 1 (1992). There, an inmate sued prison guards under S 1983 alleging that they had used excessive force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment even though he had not suffered serious injuries during the alleged assault. The Court therefore had to decide "whether the use of excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury." Hudson, 503 U.S. at 4 (emphasis added). The Court "answer[ed] that question in the affirmative." Id.

We applied the teachings of Hudson in Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000). There, an inmate sued four prison guards under S 1983 alleging that they had beaten him in violation of the Eighth Amendment. Although the undisputed medical evidence showed that the plaintiff suffered only a few scratches on his neck and hands, he testified that he was repeatedly punched in the head, stomped about the back and neck, slammed into a cell wall, choked, threatened, and nearly rendered unconscious. All of this was allegedly done while he was handcuffed. See Brooks, 204 F.3d at 104. In reviewing the claim, we noted that it was "apparent that the type of vicious, prolonged attack alleged by Brooks would have resulted in far greater injuries than those which he indisputably sustained." Id. at 105. Nonetheless, we reversed the district court's grant of summary judgment, stating: "[a]ccepting Brooks's allegations as true, as we must, a jury could find that the defendants acted not merely in good-faith to maintain or

restore discipline, but rather out of malice for the very purpose of causing harm." Id. at 109.

The district court dismissed Smith's claims before we decided Brooks. Accordingly, the court did not have the benefit of that analysis when, in denying Smith's claims here, it focused almost exclusively on "the lack of a serious physical injury. . . ." Smith II, 1999 WL 178539, at *4, quoting Eppers v. Dragovich, No. 95-7673, 1996 WL 420830, at * 4 (E.D. Pa. July 24, 1996). It is now clear that the district court erred in focusing so narrowly on the absence of serious injuries in deciding if Smith could establish a claim based upon excessive force. As we clearly stated in Brooks, the Eighth Amendment analysis must be driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries.

> Requiring objective or independent proof of minor or significant injury, would ignore this teaching and place protection from injury, instead of protection from wanton force, at the hub of the Eighth Amendment.

Brooks, 204 F.3d at 108, citing Moore v. Holbrook, 2 F.3d 697, 700 (6th Cir. 1993).

Nevertheless, it is true that the Eighth Amendment does not protect an inmate against an objectively de minimis use of force. See Hudson, 503 U.S. at 9-10. Rather, as noted above, the pivotal inquiry in reviewing an inmate'sS 1983 claim for excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Brooks, 204 F.3d at 106, citing Hudson, 503 U.S. at 7. However, injuries are only one of several factors that a court must consider in answering that question.

> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

Brooks, 204 F.3d at 106, citing Hudson , 503 U.S. at 7. Therefore, de minimis injuries do not necessarily establish de minimis force.

> If we were to adopt the District Court's reasoning, a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were

> inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis.

Brooks, 204 F.3d at 108.

We do not, of course, suggest that a fact finder could not consider the de minimis nature of injuries along with all of the other circumstances in concluding that the force that was employed could not have risen to the level required for an Eighth Amendment violation. A properly instructed fact finder could, after considering all of the evidence, conclude that Smith's injuries were so minor that the defendants' account of the incident is more credible than Smith's, and/or that the force used was not of constitutional dimension. That may have been exactly what the district court did here. However, that is an issue of fact to be resolved by the fact finder based upon the totality of the evidence; it is not an issue of law a court can decide.4

Punching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is "repugnant to the conscience of mankind," absent the extraordinary circumstances necessary to justify that kind of force. Hudson, 503 U.S. at 10. Smith alleges he was the victim of an unprovoked and unjustified beating. The district court dismissed his Eighth Amendment claims, noting that "the record shows that defendants reasonably perceived plaintiff to be a threat and the need for the application of force was

_____

4. In Brooks, we noted that when courts focus on the extent of the injury, it is important to recognize that "an inmate who is proceeding pro se, is in a decidedly difficult position from which to generate 'record evidence' on his behalf . . . [u]nder these circumstances, his affidavits . . . are about the best that can be expected from him [at summary judgment phase of] the proceedings." Brooks, 204 F.3d at 108 n.7 (emphasis added), quoting Norman v. Taylor, 25 F.3d 1259, 1265 (4th Cir. 1994) (Hall, J., dissenting).

11

apparent." Smith II, 1999 WL 178539, at *5. The court reached that conclusion in part because it found that Smith had created a disturbance by "allegedly  punching C.O. Mensinger twice in the eye," as well as "continually struggling with the defendants . . . ." Id . (emphasis added). However, Smith alleges that he was handcuffed behind his back during the "disturbance," and he maintains he did not hit Mensinger or struggle with the guards as they punched and kicked him, and rammed his head into the wall. If we accept Smith's version of the facts as true, as we must, there was simply no justification for the defendants' conduct, and the district court's ruling to the contrary can not stand.5

Defendants argue that we should nevertheless affirm the grant of summary judgment in favor of Officers Androshick, McCole, Zubris, and Jones because Smith concedes that he

is not sure that they participated in the beating at all. However, the fact that Smith has acknowledged that he could not see those defendants during the beating neither negates their involvement nor their liability as a matter of law. Smith testified: "Officer Yurkiewicz, Zubris, Androshick, McCole, Jones, all of them was in back of me and they were pushing my head, right, into the cabinets in the wall, cabinets and walls. And then after that, I was knocked to the floor." App. at 166 (emphasis added). He further testified: ". . . the full force of all the guards [was]

_____

5. The district court was also concerned about the potential for an escalating confrontation with other inmates because "other prisoners on the cell block were not locked in their cells and were being let out into the yard." Smith II, 1999 WL 178539, at *5. However, Smith alleges that the beating occurred out of sight of the other inmates. Moreover, even if others could see what was occurring, the reasonableness of the force used would still be an issue of fact for a jury, not an issue of law for the court. As we noted in Brooks, "while . . . application of some force may have been needed" to maintain order, "[the plaintiff] was shackled at the time [of the beating] so that the extent of his threat to staff would not have been great." Brooks, 204 F.3d at 106.

Furthermore, even assuming that other inmates could see Smith, it is difficult to understand how beating a handcuffed inmate in the presence of other inmates in the manner Smith alleges could reasonably be calculated to reduce tension and restore order inside a prison.

12

behind me, they rammed my head into the cabinet and into the wall . . . No, I didn't say he [Yurkiewicz] did. I said all of them." Id. at 168 (emphasis added). That testimony is sufficient to create a genuine issue of material fact as to each of those defendants. See Brooks, 204 F.3d at 109.

Moreover, it is undisputed that all of the named officers were in the vicinity at some point when Smith alleges he was beaten. The extent of each officer's participation is thus a classic factual dispute to be resolved by the fact finder. Accordingly, we will vacate the judgment in favor of defendants Novitsky, Yurkiewicz, Androshick, McCole, Zubris, and Jones and remand the matter for further proceedings.

C. Officer Paulukonis' Duty to Intervene

As noted earlier, Smith does not allege that Paulukonis took part in the beating. Rather, Smith claims that Paulukonis can be liable under the Eighth Amendment if he failed to intervene. We agree. We hold that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under S 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so. Furthermore, we hold that a corrections officer can not escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers.

Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior. "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); accord Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972). However, an officer is only liable if there is a realistic and reasonable opportunity to intervene. See Clark, 783 F.2d at 1007 (instructing the district court upon remand to determine whether the officer was in a position

13

to intervene); Brishke, 466 F.2d at 11 (liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge); Putman, 639 F.2d at 423-24 (liability exists only if the non-intervening officer saw the beating or had time to reach the offending officer).

In Baker v. Monroe Township, 50 F.3d 1186 (3d. Cir. 1995), we held that a police officer who was the senior officer involved in executing a search warrant could be liable in a suit under S 1983 even though he did not personally use excessive force, nor direct anyone else to. We concluded that "there [was] sufficient evidence to permit an inference that [the officer] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting under his supervision." Baker, 50 F.3d at 1193. The specific circumstances in Baker required us to determine if the plaintiff had shown that the senior officer had "actual knowledge and acquiescence." Id. at 1194, quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Although the specific context of our analysis only involved an officer's liability for the actions of police officers under his supervision, we do not interpret Baker as suggesting that liability for failure to intervene is solely limited to supervisors or officers who outrank their offending colleagues.

The duty to uphold the law does not turn upon an officer's rank. It is neither affected by, nor proportional to, a non-intervening officer's relationship to an offending colleague. The approving silence emanating from the officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows. Such silence is an endorsement of the constitutional violation resulting from the illegal use of force. 6 It is incompatible with the restrictions imposed under the

_____

6. The message that emanates from such silence was vocalized in

Hudson where the supervisor allegedly stood by and told officers who were beating an inmate "not to have too much fun." Hudson, 503 U.S. at 4.

14

Eighth Amendment, and is therefore unacceptable. We will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it. The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs.

Although our case law refers to police officers, not corrections officers, this does not change our analysis.[7] Both are law enforcement officers, both are sworn to uphold the law, and both are authorized to use force (even deadly force) toward that end. We are, of course, aware of the obvious security concerns inside the close confines of a prison. However, that is simply one factor that must be considered in determining if a particular application of force is reasonable. It does not suggest a different Eighth Amendment inquiry for corrections officers as opposed to police officers. The law does not allow either to condone or cover up the use of excessive force. Similarly, neither can escape liability by turning either a blind eye or deaf ear to the illegal conduct of their colleagues.

Therefore, "if [Smith] can show at trial that an officer attacked him while [Paulukonis] ignored a realistic opportunity to intervene, he can recover." Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000). Moreover, neither rank nor supervisory status is a factor in assessing whether Paulukonis had "a realistic opportunity to intervene." Id.[8]

_____

7. We have, however, held that a corrections officer's acquiescence can result in liability under S 1983 in a very different context than we are confronted with here. See Curtis v. Everette, 489 F.2d 516 (3rd Cir. 1973).

8. Although it is clear that Paulokonis' junior rank and lack of supervisory status does not immunize him from liability for failing to intervene, we do not suggest that a fact finder could not conclude that the conduct of a supervisor who fails to intervene is even more reprehensible and blameworthy than that of a more junior officer. The fact that rank does not shield one from liability does not mean that a fact finder must ignore the even greater dereliction of duty that occurs when a supervisor tolerates the kind of misconduct that is alleged here.

15

There is some evidence that Paulukonis witnessed the beating that his fellow officers allegedly administered to Smith. Smith alleges that Paulukonis stated in his misconduct report that "[t]he minimum amount of force

was used to place inmate Smith onto the floor." App. at 329. This appears to be based upon first-hand observations Paulukonis made while standing at the door of the Unit Manager's office during the incident. Smith further testified that the door of the office remained open throughout the incident and that Paulukonis saw the beating. A fact finder could conclude that Paulukonis knew that his fellow officers were using excessive force against Smith, had an opportunity to intervene, but refused to do so. Accordingly, the district court erred in dismissing Smith's Eighth Amendment claim against Paulukonis.

D. Smith's Due Process Claim

In a separate opinion, the district court also held that Smith could not establish a due process claim under Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997). See Smith I, 1998 WL 151803, at *5. The district court reasoned that Smith "was subjected to seven months disciplinary time, a period of time half of that implicated in Griffin." Id. The court reasoned that, even assuming that the misconduct reports were issued to cover up the use of excessive force, the disciplinary sanction still did not constitute a due process violation as it did not rise to the level of an"atypical and significant hardship in relation to the ordinary incidents of prison life." Id., quoting Griffin , 112 F.3d at 706.

Smith argues that the district court misinterpreted the basis of his due process claim. Smith does not claim that the seven months disciplinary sanction was a violation of a liberty interest and therefore a denial of due process. Rather, Smith claims that Mensinger issued a misconduct report to retaliate against Smith for his conduct toward Mensinger and to cover up a beating. Thus, Smith claims that the misconduct report was not intended to enforce prison regulations at all, and it was therefore improper to impose a disciplinary sanction.9 However, even assuming

_____

9. As noted earlier, we will interpret Smith's pro se complaint liberally. See Zilich, 981 F.2d at 694.

that the district court did misconstrue the crux of Smith's due process claim, it is nevertheless evident that the court's rejection of that claim was correct.

In Sandin v. Conner, 515 U.S. 472 (1995), an inmate had been charged with multiple disciplinary infractions, but the inmate's request to produce certain witnesses at his hearing was refused by the hearing committee because the witnesses were unavailable. The committee found the inmate guilty of the charged misconduct and sentenced him to 30 days in segregated confinement. Thereafter, he brought a S 1983 suit claiming that the hearing did not satisfy the requirements of due process. See Sandin, 515 U.S. at 475-76. The Court disagreed. The Court held that confinement in administrative or punitive segregation will

rarely be sufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. Therefore, the Court found that the inmate's segregated confinement was not a denial of due process. See id. at 486.

Prison disciplinary proceedings may, however, constitute a denial of due process in the context of a civil rights action under S 1983 when they are instituted for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right. In Allah v. Seiverling, 229 F.3d 220 (3d Cir. 2000), we stated:

> Sandin instructs that placement in administrative confinement will generally not create a liberty interest. Retaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest. [G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.

Seiverling, 229 F.3d at 224 (internal citations and quotation marks omitted).

We have previously held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment guarantee of access to the courts. See Millhouse v. Carlson, 652 F.2d 371, 374 (3d

17

Cir. 1981). In Millhouse, the inmate alleged that prison officials retaliated against him by fabricating misconduct charges in response to his civil rights suit against the prison officials. We concluded that "[s]uch allegations, if proven at trial, would establish an infringement of Millhouse's first amendment right of access to the courts." Millhouse, 652 F.2d at 374.

Although Millhouse also involved an allegation that prison officials fabricated misconduct charges, that case is distinguishable from Smith's because the conduct in Millhouse implicated a constitutional right--the First Amendment right to access to the courts. Smith's purported liberty deprivation, on the other hand, implicates no constitutional right and therefore can not overcome the hurdle erected by the holding in Sandin. See Sandin, 515 U.S. at 486. Under Sandin, an administrative sentence of disciplinary confinement, by itself, is not sufficient to create a liberty interest, and Smith does not claim that another constitutional right (such as access to the courts) was violated. Accordingly, we hold that the district court correctly dismissed Smith's due process claim.

In dismissing the claims, the district court correctly relied upon the analysis of the Court of Appeals for the Second Circuit in Freeman v. Rideout, 808 F. 2d 949 (2d

Cir. 1986). In Freeman, an inmate brought a due process claim against prison authorities under S 1983 alleging that the prison officials' use of falsified evidence and bogus misconduct reports resulted in his being unconstitutionally confined in punitive segregation for 30 days. See Freeman, 808 F.2d at 951. The plaintiff was awarded damages following a trial, but the award was reversed on appeal. The court of appeals concluded that, with respect to the misconduct hearing, due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly falsified evidence and groundless misconduct reports. Thus, so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim. See id. at 953.

Smith argues that "there is more" to his claim However, he must clear two hurdles to overcome the district court's

18

reliance on Freeman. First, it is now clear that the sanction Smith challenges (seven months disciplinary confinement) does not, on its own, violate a protected liberty interest as defined in Sandin. Therefore, he can not establish that the defendants' conduct denied him substantive due process by infringing upon a liberty interest. Second, he was afforded a hearing and therefore had the opportunity to confront and challenge the allegedly perjured testimony offered in support of the misconduct reports. Under Freeman , that is all he was entitled to.

Smith cites several cases in arguing that the district court erred in relying upon Freeman. However, the cases he cites are either distinguishable, or were decided before Sandin, and are therefore of little precedential value.10 We

_____

10. The cases Smith cites in support of his argument are distinguishable in that they allege the deprivation of a constitutional right or liberty interest apart from, or in conjunction with, the inmate's segregation from the greater prison population. See, e.g., Seiverling, 229 F.3d at 225 (administrative segregation in retaliation for filing law suits violated inmate's access to the courts); Millhouse, 652 F.2d at 374 (same); Grillo v. Coughlin, 31 F.3d 53 (2d Cir. 1994) (the hearing itself did not comport with due process because the fact finder was given falsified documents that differed from the copies the inmate received); Franco v. Kelly, 854 F.2d 584 (2d Cir. 1988) (inmate alleged that misconduct reports were fabricated in retaliation for his cooperation with an investigation by the state's Inspector General, thus implicating his right to petition the government for redress of grievances); Cale v. Johnson, 861 F.2d 943 (6th Cir. 1988) (allegations that prison officials fabricated misconduct charge in retaliation for inmate's complaint about food was actionable as a Bivens suit); Sprouse v. Babcock, 870 F.2d 450 (8th Cir. 1989) (false misconduct charges constituted retaliation for filing lawsuits and therefore stated a claim under S 1983 because it implicated access to the courts); Harbury v. Deutch, 233 F.3d 596 (D.C. Cir. 2000) (allegations of false statements designed to forestall a Bivens action stated a claim for denial of access to the courts).

Rhodes v. Robinson, 612 F.2d 766 (3d Cir. 1979) and Black v. Lane, 22 F.3d 1395 (7th Cir. 1994) are the only two cases cited by Smith that appear to support Smith's claims. However, both Rhodes and Black were decided before Sandin.

Although Smith alleges that he was cited in the misconduct reports to cover up the defendants' own improper conduct, his complaint does not

19

suggest a retaliatory motive that would implicate a constitutional right such as access to the courts. Accordingly, accepting Smith's allegations as true, he claims only that defendants' conduct was improper and in bad faith, not that it denied him the due process that must form the basis of his S 1983 claims.

11. In affirming the dismissal of the due process claims we do not suggest that we agree with the district court's conclusion that Smith is improperly attempting to collaterally attack his state court conviction for disorderly conduct. He pled nolo contendere to that charge, and that plea does not bar his due process claims here. See Thomas v. Roach, 165 F.3d 137, 144-45 (2d Cir. 1999); see also FED. R. EVID. 410. therefore find that the district court did not err in dismissing Smith's due process claims.

IV. Conclusion

Accordingly, we will affirm the district court's dismissal of Smith's due process claims.11 However, we hold that the district court erred in dismissing Smith's claims under the Eighth Amendment. Consequently, we vacate the entry of summary judgment in favor of defendants Novitsky, Yurkiewicz, Androshick, McCole, Zubris, and Jones. We also hold that corrections officers have a duty to intervene when other officers use excessive force irrespective of the rank of the offending officers. Accordingly, we will also reverse the dismissal of Smith's Eighth Amendment claim against Paulukonis.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20