**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2157
_____

TYRONE GREEN,
                          Appellant

v.

DET SNEATH;
LT. HOLTZ;
SUPT.LAWLER;
DEPUTY FISHER;
C/O SETTLE;
C/O TRESS;
C/O EBERLING;
LT. KENDRICKS;
HEARING EXAM. MITCHELL;
JOHN DOE I all are employed at SCI Huntingdon;
JOHN DOE II all are employed at SCI Huntingdon;
DEPUTY CORBIN;
CHAPLAIN KORHORCHIK

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 1-09-cv-00154)
District Judge:  Honorable Christopher C. Conner

_____

Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B)
or Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6
November 21, 2012

Before:  SCIRICA, HARDIMAN and GREENAWAY, JR., Circuit Judges

(Opinion filed: January 7, 2013 )

—————

OPINION

—————

PER CURIAM

On January 26, 2009, Tyrone Green, a Pennsylvania state inmate currently incarcerated at the State Correctional Institute at Forest, filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the Middle District of Pennsylvania, naming as defendants numerous state corrections and law enforcement officials. Green's complaint included allegations of retaliation, violations of his right to the free exercise of religion, violations of his due process rights, and the denial of his right of access to the courts. On March 26, 2012, the District Court granted the defendants' cross-motion for summary judgment. Green timely filed this appeal.

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. Because we agree with the District Court that the defendants were entitled to summary judgment on each of Green's claims, we will affirm.

I.

At the time Green filed his complaint, he was incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"). On August 24, 2006, Pennsylvania State Trooper Daniel Sneath was assigned to investigate a complaint by Green that he had been pushed down the stairs at SCI-Huntingdon by Corrections Officer Trainee Montgomery. Sneath first interviewed Green about this allegation at J.C. Blair

2

Memorial Hospital, where Green was recovering from the fall, and his investigation continued for several months after Green was returned to SCI-Huntingdon. After being discharged from the hospital, Green was transported to the State Correctional Institution at Smithfield ("SCI-Smithfield") to recuperate. While at SCI-Smithfield, Green was placed in disciplinary custody in the Restricted Housing Unit ("RHU") after receiving multiple misconduct reports charging him with threatening corrections staff.

On September 6, 2006, Green returned to SCI-Huntington and was placed in the facility's RHU. Green's request to be released into the general population was denied by prison officials, who informed Green that when an inmate alleges that he was assaulted by corrections staff, he is placed in administrative custody for his own safety pending an investigation. In the ensuing months, Trooper Sneath's investigation into Green's allegations continued, and included additional interviews with Green as well as interviews with Officer Montgomery and at least one other corrections officer who was present at the time Green alleged that he was pushed down the stairs. During his follow-up interviews with Sneath, Green alleged that while at SCI-Smithfield he was tortured and issued fabricated misconduct reports. On October 3, 2006, Green filed a civil lawsuit in Pennsylvania state court, naming numerous corrections officials as defendants.

On December 19, 2006, Sneath interviewed Green again at SCI-Huntingdon. Green contends that during this interview, Sneath and a corrections official from SCI-Smithfield threatened that if he did not drop his complaint against Officer Montgomery, he would remain the RHU for the duration of the investigation, which could take years.

3

Green also alleges that Sneath told him that SCI-Smithfield employees were interviewed and had no recollection of Green. Green did not thereafter drop his complaint against Officer Montgomery. On February 26, 2007, Sneath terminated the investigation after finding no evidence to corroborate Green's claims that he was pushed down the stairs by Office Montgomery or that he was mistreated while recuperating at SCI-Smithfield.

On April 10, 2008, Green was placed in the RHU pending the completion of an unrelated investigation into whether he violated prison rules. Green was released into the general population three weeks later, after sufficient evidence was not found to warrant a misconduct charge. On December 8, 2008, Green was again placed in the RHU, this time because a search of his cell on December 4, 2008, uncovered an unauthorized razor and, according to corrections officials, Green became agitated and threatening when he was ordered to leave his cell. Green was thereafter taken to the infirmary and placed on suicide watch before being transferred to the RHU because corrections officials determined that he was a danger to himself. On December 5, 2008, Green was issued a misconduct report relating to the incident, charging him with threatening an employee, refusing to obey an order, and possession of contraband in the form of a weapon.

On December 16, 2008, Green was transferred to a different cell within the RHU. According to Green, the corrections officer who moved him to his new cell made negative remarks about Green's complaint against Officer Montgomery. After moving to the new cell, Green was no longer in possession of his Quran. On December 17, 2008, Green filed a grievance charging that his Quran was purposely taken from him during the

4

cell transfer. He requested the names of the officers who discarded his Quran, as well as $50,000 in damages. On January 19, 2009, the grievance officer found the claim without merit, informing Green that pursuant to prison policy it was his responsibility to bring the Quran with him when he moved to a new cell, and because he failed to do so the Quran was discarded along with any other property that remained in his old cell. The grievance officer also noted that Green had since been supplied with a new Quran, albeit a different translation, and that prison officials were working on obtaining a replacement copy of Green's preferred version. Green's direct administrative appeal of the decision was denied, as was his final appeal to the Secretary's Office of Grievances and Appeals.

II.

Green advances a number of retaliation claims in his § 1983 complaint, arguing that his First Amendment right to free expression was infringed. We agree with the District Court that the defendants were entitled to summary judgment on these claims.

Green's claim that Sneath and the SCI-Smithfield official coerced him into dropping his criminal complaint against Officer Montgomery during the December 19, 2006, interview is barred by the applicable two-year statute of limitations. See Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009). Green does not dispute that this claim accrued on December 19, 2006. The instant complaint was signed by Green on January 21, 2009, more than one month beyond the two-year deadline for the claim to be considered timely.

Green's remaining retaliation claims allege that as a result of his pursuing a criminal complaint against Officer Montgomery and filing a civil action against prison

officials in state court, he was placed in the RHU on April 10, 2008, and December 8, 2008, and then moved from one RHU cell to another on December 16, 2008, during which time his Quran was destroyed. We agree with the District Court that, at least with respect to Green's filing of a civil suit against prison officials in state court, he was engaged in conduct protected from retaliation under the First Amendment. See Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002). We also agree that placement within the RHU for filing a civil action may be sufficient to constitute adverse action. However, as the District Court observed, Green is required to demonstrate a causal connection between the exercise of his constitutionally protected rights and his placements within the RHU in order to prevail on a retaliation claim under § 1983. See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). Green attempts to demonstrate such a causal link by asserting that an April 10, 2008, order of the state court in his civil suit, which had at that time been pending for 18 months, directly resulted in the prison's repeated decisions to place him in the RHU. We agree with the District Court that this scenario is implausible not only because the state court's order was temporally attenuated from the allegedly retaliatory responses, but also because the order was actually favorable to prison officials.

III.

Green also argues that his right to the free exercise of religion was infringed based on his allegation that his Quran was intentionally taken from him during his RHU cell transfer on December 16, 2008. The defendants responded on summary judgment with evidence that prison policy is that inmates are responsible for taking all property with

6

them during cell transfers, and any property left behind is discarded. We agree with the District Court that Green fails to establish that he was prohibited from practicing his religion in violation of the First Amendment under the four-factor test set forth by the Supreme Court in Turner v. Safley, 482 U.S. 78, 89 (1987). The first Turner factor asks whether the action that is alleged to have infringed on the inmate-plaintiff's religious rights is reasonably related to a legitimate penological interest. See Sharp v. Johnson, 669 F.3d 144, 156 (3d Cir. 2012). On this factor, courts afford substantial deference to the judgment of prison officials, who undertake the "formidable task" of administering a prison. See Sutton v. Rasheed, 323 F.3d 236, 254 (3d Cir. 2003). Here, we find that Green points to no evidence in the record that his Quran was intentionally thrown out rather than discarded pursuant to prison policy regarding inmate property left behind during cell transfers. See McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007) (when burden in summary judgment shifts back to non-moving party, that party must point to "specific facts" in the record such that a reasonable jury could find in its favor). Accordingly, we find that the first Turner factor, which is "foremost" in the analysis, weighs against finding a First Amendment violation here. See Sutton, 323 F.3d at 253; see also Sharp, 669 F.3d at 156 (noting that the burden on prisons to show that an action is reasonably related to a legitimate interest is "slight").

Moreover, we find that the remaining Turner factors also weigh against finding that Green's First Amendment right to the free exercise of religion was infringed. The second factor asks whether the prisoner has an alternate means of exercising their

7

constitutional right. Turner, 482 U.S. at 90. In this context, the relevant inquiry is whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice. See Sutton, 323 F.3d at 255. Here, after Green's lost possession of his Quran, corrections officials provided him with a replacement within one day. When Green rejected the replacement because it was not the translation he preferred, officials sought to obtain a satisfactory version. Although there was a bureaucratic delay in finally delivering the new version of the Quran to Green, we cannot conclude under these circumstances that he lacked an alternate means of practicing his religion generally. We conclude that the third and fourth Turner factors, which focus on the impact that accommodating the inmate's religious practice would have on prison staff and other inmates, also do not sufficiently weigh in Green's favor.

We also agree with the District Court that Green fails to establish that he suffered a substantial burden on the practice of his religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a)(1)-(2) (2009). This Court has explained that in order to establish a substantial burden on the practice of his religion under RLUIPA, an inmate-plaintiff must show that (1) following the precepts of his religion would force him to forfeit the benefits otherwise available to other inmates; or (2) he faced substantial pressure to modify his behavior and violate his beliefs. See Washington v. Klem, 497 F.3d 272, 277-80 (3d Cir. 2007). Under this standard, we do not find that the circumstances surrounding Green's loss of his Quran, or

8

the prison's administrative delay in obtaining for him a replacement of his preferred translation, was sufficient to constitute a substantial burden under RLUIPA.

IV.

Green further claims that his due process rights were violated on December 5, 2008, when he was issued a misconduct report for threatening an employee, refusing to obey an order, and possession of a weapon. Green alleges that the report was fabricated and that he did not receive adequate notice of the charges against him. The Due Process Clause does not provide inmates with protection against the imposition of discipline unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 486 (1995). We have held that confinement in administrative or punitive segregation is insufficient, without more, to establish the requisite "atypical" hardship necessary to implicate a liberty interest. See Griffin v. Vaughn, 112 F.3d 703, 706-07 (3d Cir. 1997). Here, Green was issued a misconduct report because a search of his cell uncovered a weapon and he became threatening when ordered to leave his cell. Green was read the charges contained in the misconduct report, rather than being provided with a copy of the report, because inmates on suicide watch are prohibited from having paperwork in their cell. Following a hearing at which he was found guilty, Green was sent to the RHU for 60 days of disciplinary custody. Under these circumstances, we cannot conclude that Green was subjected to the sort of "atypical and "significant" discipline contemplated in Sandin and

9

Griffin.  See Smith v. Mensinger, 293 F.3d 641, 652 (3d Cir. 2001) (finding 7-month term of disciplinary custody insufficient to trigger due process violation).

V.

Finally, Green alleges that he was denied his right of access to the courts when Trooper Sneath and an official from SCI-Smithfield threatened him into dropping the complaint against Officer Montgomery.  We agree with the District Court that this claim, which accrued on December 19, 2006, and was not filed until January 21, 2009, is barred by the applicable two-year statute of limitations.  See Kach, 589 F.3d at 634.

VI.

For the foregoing reasons, we will summarily affirm the judgment of the District Court.